UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| 1100 WEST, LLC, | ) | |
|      Plaintiff/Counter-Defendant, | ) | |
| | ) | |
| vs. | ) | 1:05-cv-1670-LJM-WTL |
| | ) | |
| RED SPOT PAINT AND VARNISH CO., | ) | |
| INC., | ) | |
|      Defendant/Counterclaimant. | ) | |

## ORDER ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT

This cause is now before the Court on plaintiff/counter-defendant's, 1100 West, LLC ("1100 West"), Motion for Partial Summary Judgment on Counts II and III of defendant/counterclaimant's, Red Spot Paint and Varnish Co., Inc. ("Red Spot"), First Amended Complaint.  1100 West has also moved to exclude the expert testimony and report of Stanley Feenstra ("Feenstra")and Paul Troy ("Troy"), and to strike section C of Red Spot's surreply.  In short, 1100 West claims that Red Spot's counterclaim under Indiana Code § 13-30-1, the citizen suit provision of Indiana's environmental laws, fails because Red Spot does not meet the statutory requirements for such a suit under Indiana Code § 13-30-1-3, because the Indiana Department of Environmental Management ("IDEM") initiated an administrative proceeding against 1100 West on September 15, 2006, and because 1000 West did not cause the contamination at issue in that claim.  Further, 1000 West claims that Red Spot's environmental legal action under Indiana Code § 13-30-9-2, fails because 1000 West did not cause or contribute to the release of the hazardous substance at issue.

In addition, this cause is now before the Court on Red Spot's Motion for Partial Summary Judgment on 1100 West's claim for lost profits.  Red Spot contends that 1000 West's claim that Red

Spot is liable for lost opportunity costs related to 1000 West's inability to construct and sell a building on the contaminated property in this suit is unsupported by Indiana law and speculative. Red Spot has also moved to exclude the testimony of R. James Alerding ("Alerding"), to limit the expert testimony of Vasiliki Keramida, Ph.D. ("Keramida"), and to exclude and/or strike the rebuttal opinions and report of Keramida.

For the reasons stated herein, the Court **GRANTS** 1100 West's Motion for Partial Summary Judgment; and **GRANTS** Red Spot's Motion for Partial Summary Judgment. In addition, the Court: **DENIES as MOOT** 1100 West's Motion to Exclude Expert Testimony and Report of Stanley Feenstra and Paul Troy; **DENIES as MOOT** 1000 West's Motion to Strike Section C of Surreply; **GRANTS** Red Spot's Motion to Exclude Testimony of R. James Alerding; **DENIES as MOOT** Red Spot's Motion to Limit Expert Testimony of Vasiliki Keramida, Ph.D.; **DENIES as MOOT** Red Spot's Motion to Exclude and/or Strike Rebuttal Opinions and Report of Vasiliki Karamida, Ph.D.

## I.  BACKGROUND

The relevant facts follow:

1100 West is an Indiana limited liability company with its principal place of business located in Evansville, Indiana.  Rogers Aff. ¶ 2; Fruth Aff. ¶ 2.  1100 West is in the business of purchasing older industrial sites, selectively demolishing certain structures on the sites, and reconstructing or re-utilizing existing structures on the sites for lease or resale.  Rogers Aff. ¶ 7; Fruth Aff. ¶ 7.  Jerry Lynn Fruth ("Fruth") and John F. Rogers, II ("Rogers"), are the sole owners of 1100 West.  Fruth Dep. at 22.  Fruth has been in the commercial real estate development business since 1988.  Fruth Aff. ¶ 3.  Rogers has been a licensed real estate broker since 1970 and has been in the commercial

2

real estate development business since 1977.  Rogers Aff. ¶ 3.  In 1979 Rogers was awarded the designation of Certified Commercial Investment Member ("CCIM") by the National Association of Realtors.  *Id.*  Rogers attests that he keeps his CCIM designation current with periodic classes and updates.  *Id.*  Fruth and Rogers started their first commercial real estate development business together in 1988 and have had many such concerns in the years since then.  Rogers Aff. ¶¶ 5-8; Fruth Aff. ¶¶ 5-8.

1100 West owns a seven-acre parcel of improved real estate located at 1011 East Columbia Street, Evansville, Indiana (the "1000 W. Property").  Compl. ¶ 6.  Franklin Industrial Center, Inc. ("FICI"), which is also owned by Fruth and Rogers, originally acquired the 1100 W. Property from the bankruptcy estate of Preway, Inc., in 1991 as part of its purchase of a fifty-five-acre former heavy industrial park for $30,000.00.  Fruth Dep. at 32-33; Fruth Aff. ¶ 9.

Prior to the purchase of the property, Fruth and Rogers had environmental groundwater testing performed there.  Fruth Dep. at 49-50 & Exs. 79 & 101.  The 1989 sampling showed the presence of TCE in the groundwater at the 1100 W. Property.  Feenstra Decl. ¶ 6(v).  Fruth believed that the groundwater contamination at the 1100 W. Property would need to be remediated.  Fruth Dep. Exs. 86, 87 & 88.  On September 17, 1990, Fruth sent a letter to Bill Butler ("Butler"), an attorney, stating that monitoring "wells 3, 4, 5, and 12 will need to be stripped."  Fruth Dep. at 74-77 & Ex. 86.  Monitoring well 12 is on the 1100 W. Property.  Fruth Dep. at 77 & Ex. 79.  On November 23, 1990, Fruth sent another letter to Butler stating, "There are four areas of environmental remediation at the [FICI] facility," including "areas of groundwater contamination that will require either air stripping, or aeration of the groundwater.  Contaminants are Percholorethylene, Tricholorethylene, Tricholoroethane, and some areas with high lead."  Fruth Dep.

3

at 80-82 & Ex. 88.  Later, however, Fruth came to realize that there was no contamination on the property that needed remediation.  Fruth Supp. Aff. ¶¶ 3-5; Rogers Dep. at 125.

Since approximately 1991, the south five acres of the 1100 W. Property have been occupied for various periods by either Meisler Trucking ("Meisler") or Diamond Equipment Company ("Diamond").  Rogers Aff. ¶ 9; Fruth Aff. ¶ 9.  Meisler stored empty trailers on the 1100 W. Property.  Rogers Aff. ¶ 10; Fruth Aff. ¶ 10.  Meisler never stored or used trichloroethylene ("TCE") or any other chemical on the 1100 W. Property.  Rogers Aff. ¶ 10; Fruth Aff. ¶ 10.  Diamond used the 1100 W. Property for a short period of approximately three months to store construction equipment.  Rogers Aff. ¶ 11; Fruth Aff. ¶ 11.  Diamond never stored or used TCE or any other chemical on the property.  Rogers Aff. ¶ 11; Fruth Aff. ¶ 11.

Since approximately 1993, the north two acres of the 1100 W. Property has been occupied by Goedeke, Inc. *Id.* ¶ 7.  Goedeke operates a business that involves leasing metal forms for use in construction projects that involve pouring concrete.  Rogers Aff. ¶ 8; Fruth Aff. ¶ 8.  Goedeke never used or stored TCE on the 1100 W. Property.  Rogers Aff. ¶ 8; Fruth Aff. ¶ 8; Wagner Aff. ¶ 5.

According to Rogers and Fruth, at no time has either 1100 West, Rogers, Fruth, or any entity owned by any of them, or any person acting at the direction of any of the foregoing, stored, used or released any TCE, or any product containing TCE, on the 1100 W. Property.  Rogers Aff. ¶ 12; Fruth Aff. ¶ 12.

In 2000, FICI began the design, pricing and reconstruction of Buildings 53 and 54, and 1100 West began the design and pricing of Building 60.  Rogers Aff. ¶ 12; Fruth Aff. ¶ 12.  Reconstruction of Buildings 53 and 54 was completed and the buildings were leased in 2001.  Rogers Aff. ¶ 14; Fruth Aff. ¶ 14.  In November 2001, IDEM issued a letter that stated that the

property upon which Buildings 53 and 54 had been reconstructed did not require remediation. Rogers Aff. ¶ 13; Fruth Aff. ¶ 13.  In December 2001, Buildings 53 and 54 were sold.  Rogers Aff. ¶ 14; Fruth Aff. ¶ 14.

According to Rogers and Fruth, in 2001/2002, 1100 West incurred $2,079,500.00 in lost profits as a result of its alleged inability to build and sell a 175,000 square foot warehouse ("Building 60") on the 1100 W. Property because of environmental contamination thereon.  Rogers Dep. at 105 & Ex. 93; Fruth Dep. at 41, 91, 108-09.  At the time that 1100 West purchased the 1100 W. Property it contained a building on the site of the proposed Building 60.  Fruth Dep. at 41-42.  1100 West demolished the original building because of its poor physical condition.  Fruth Dep. at 42.  In its normal course of doing business, when it acquires a new piece of real estate 1100 West will create drawings of various proposed structures for the site; this is called the "drawing phase."  Rogers Aff. ¶¶ 16, 18; Fruth Aff. ¶¶ 15, 17.  If the drawing phase produces a structure that best suits the particular site, 1100 West then contacts various contractors to obtain "reconstruction" price estimates and creates a "reconstruction" budget; this is called the "pricing phase."  Rogers Aff. ¶¶ 16, 18; Fruth Aff. ¶¶ 15, 17.  According to Fruth, with respect to Building 60, 1100 West had completed the drawing phase and the pricing phase, up to the point of producing a reconstruction budget, when 1100 West determined it could not continue reconstruction.  Fruth Aff. ¶ 19.

The lost profit estimate for Building 60 is based upon an opportunity cost model prepared by Rogers in 2005.  Rogers Dep. at 106 & Dep. Exs. 93 & 94.  Rogers based his opportunity cost model on construction estimates he received from Fruth.  *Id.*  Fruth developed these construction estimates using extrapolations from quotations he received for other construction projects, including the remodeling of Buildings 53 and 54, located to the south of the planned location for Building 60.

Fruth Dep. at 114-16.  In addition, Marvin Schriber ("Schriber"), a concrete contractor, and Robert Hamilton ("Hamilton"), a steel building contractor, provided assistance in preparing the construction estimate for the proposed Building 60.  Fruth Dep. at 102.  1100 West did not have any contracts with either Schriber or Hamilton to construct Building 60.  *Id.*

1100 West claims that two drawings labeled Exhibits 96 and 97 are proof of its intent to construct Building 60.  Rogers Dep. Exs. 96 & 97; Rogers Dep. at 12, 85-86.  Exhibits 96 and 97 are stamped "1100 West LLC.  Building 61."[1]  Rogers Dep. Exs. 96 & 97.  On both Exhibits 96 and 97, one reference to "Building 61" has a "0" superimposed over the "1" in "61."  Rogers Dep. Exs. 96 & 97.  Fruth claims this was a drafting error, which is evidenced by the fact that the Building 61 site is not large enough to house the warehouse that is represented by the drawings in Exs. 96 & 97.  Fruth Aff. ¶ 21.

According to Fruth and Rogers, 1100 West had discussions with several companies regarding their need for additional warehousing in the area where 1100 West planned to construct Building 60.  Fruth Dep. at 96-99, 169; Rogers Dep. at 95-96.  Furthermore, Fruth and Rogers assert that the Building 60 site had an existing concrete pad upon which the warehouse could be built, which would result in lower reconstruction costs.  Rogers Dep. at 55-56; Rogers Aff. ¶ 26.  In addition, Building 60 had advantages over Buildings 53 and 54, which would have made it more attractive to customers than those buildings.  Rogers Aff. ¶ 27.

However, 1100 West never marketed the Building 60 site.  Fruth Dep. at 108.  1100 West did not have any pre-lease agreements in place at any time for Building 60.  Fruth Dep. at 94; Rogers Dep. at 10.  1100 West did not have any letter of intent to lease Building 60; it did not have any

---

[1]Building 61 on the 1100 W. Property is currently leased to Goedeke.  Fruth Dep. at 41.

specific tenants lined up as prospects for either leasing or purchasing the building.  Rogers Dep. at
6-8, 103.  1100 West did not have a developer lease agreement with respect to Building 60.  Rogers
Dep. at 11-12.  1100 West did not have any build-to-suit agreements in place at any time for
Building 60.  Fruth Dep. at 94; Rogers Dep. at 9-10.  1100 West never obtained a building permit
for construction of Building 60.  Fruth Dep. at 99; Rogers Dep. at 12.

According to Red Spot's expert, John C. Snell ("Snell"), Rogers' opportunity cost model
assumes that if the 1100 W. Property is not capable of supporting development, then lost profits
includes not only the loss of the existing land value and any supporting improvements already in
place, but also extends to conceptual improvements such as Building 60.  Snell Decl. ¶ 8.  Snell
asserts that the improvements that are the subject of Rogers' opportunity cost model would be
classified as "Hypothetical Conditions" and would not be considered a measure of current market
value under the Uniform Standards of Professional Appraisal Practice Guidelines.  Snell Decl. ¶¶
10-11.  Snell opines that Rogers' opportunity cost model is inconsistent with a current market value
or an objective before and after impact analysis of the 1100 W. Property's value for three reasons:
(1) since1100 West never invested any equity in the Building 60 project the equity was available to
invest elsewhere for a potentially equivalent rate return, therefore, the opportunity was never lost;
(2) the debt, or financing component of the purported development of Building 60 was still available
to 1100 West for application at an alternative development location; and (3) the prospective tenants,
build-to-suit owners or speculative owners assumed by the model would be available to support an
alternative development.  Snell Decl. ¶¶ 12-14.  According to Snell, the 1100 W. Property was not
so unique such that other appropriately zoned land was unavailable for constructing a 175,000 square
foot warehouse.  Snell Decl. ¶ 15.  For example, the Evansville area contained extensive property

for such a development and surrounding regional markets such as Princeton, Indiana, and Warrick County, Indiana, would also have competitive locations for a speculative development the size of Building 60. *Id.*

On July 5, 2006, Red Spot filed a citizen-suit notice with IDEM in which it alleged that 1100 West was responsible for the TCE on the 1100 W. Property. Red Spot Am. Countercl., Ex. 1. On September 15, 2006, IDEM issued a letter ("PRP letter") to 1100 West in which IDEM identified 1100 West as a potentially responsible party for the hazardous substances located on the 1100 W. Property. Rogers Aff. ¶ 13 & Ex. A. The PRP letter requires 1100 West to perform an investigation to characterize the nature and extent of environmental contamination at the 1100 W. Property. Rogers Aff. Ex. A. The PRP letter requires a specific report format and a response within forty-five days, with the threat of statutory fines if 1100 West fails to comply. *Id.* In response to the PRP letter, 1100 West is actively engaged in sampling the subsurface and defining the extent of the contamination on the 1100 W. Property. Rogers Aff. ¶ 14.

## II. SUMMARY JUDGMENT STANDARD

As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). *See also United Ass'n of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1267-68 (7th Cir. 1990). Motions for summary judgment are governed by Federal Rule of Civil Procedure 56 (c) ("Rule 56(c)"), which provides in relevant part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials which "set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 997 (7th Cir. 1996). It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which she relies. *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996). When the moving party has met the standard of Rule 56, summary judgment is mandatory. *See Celotex*, 477 U.S. at 322-23; *Shields Enters., Inc. v. First Chi. Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992).

In evaluating a motion for summary judgment, the Court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party. *See Estate of Cole v. Fromm*, 94 F.3d 254, 257 (7th Cir. 1996). The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. *See Anderson*, 477 U.S. at 248; *JPM Inc. v. John*

*Deere Indus. Equip. Co.*, 94 F.3d 270, 273 (7th Cir. 1996). Irrelevant or unnecessary facts do not

deter summary judgment, even when in dispute. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir.

1992). "If the nonmoving party fails to establish the existence of an element essential to his case,

one on which he would bear the burden of proof at trial, summary judgment must be granted to the

moving party." *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996).

### III.  DISCUSSION

#### A.  RED SPOT'S MOTION FOR PARTIAL SUMMARY JUDGMENT & RELATED MOTION

##### 1.  Motion to Exclude Testimony of R. James Alerding

Concomitant with Red Spot's Motion for Partial Summary Judgment, is its Motion to

Exclude Testimony of R. James Alerding ("Alerding"). Red Spot argues that Alerding is not

qualified to testify to the accuracy of or the efficacy of Rogers' opportunity cost model upon which

1100 West's claim for lost profits is based. Specifically, Red Spot contends that Alerding did not

apply any relevant knowledge or expertise to the facts of the case in rendering his opinions.

Moreover, Red Spot asserts that Alerding admits that he does not have the expertise necessary to

evaluate whether or not Rogers' assumptions or calculations are correct.

1100 West claims that it intends to use Alerding's report and testimony to validate the

methodology Rogers' used to draft his opportunity cost model. Moreover, 1100 West asserts:

> To express his opinion on the appropriate method to determine lost profits, it was not
> necessary for Alerding to have investigated the bases of the numbers used in the
> calculation performed by 1100 West's owners. Such information is simply not
> required to evaluate a methodology and, ultimately, it is the province of the jury to
> determine what weight should be accorded to the number used in the calculation.
> Alerding's opinion on the propriety of 1100 West's lost profits calculation

methodology is based on his review of the calculations performed by 1100 West's owners, the elements considered in that calculation, and his experience as an accountant and business appraiser.

Pl.'s Br. in Opp'n to Def.'s Mot to Exclude Testimony and Report of R. James Alerding ("Alerding Opp'n").

The Court agrees with Red Spot that Alerding's report evidences his lack of expertise to opine on the efficacy of the methodology used in Rogers' opportunity cost model.  Under Federal Rule of Evidence 702 ("Rule 702") and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Court follows a two-prong framework:  (1) the Court must determine whether "the proposed witness would testify to valid scientific, technical, or other specialized knowledge and (2) [the Court must determine whether] his testimony will assist the trier of fact." *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 816 (7th Cir. 2004) (quotations and citations omitted).  The first prong "of this framework evaluates the reliability of the testimony." *Id.*  To determine whether Alerding's opinions are reliable the Court "'must determine whether the expert is qualified in the relevant field and whether the methodology underlying the expert's conclusions is reliable.'" *Id.* (quoting *Zelinski v. Columbia 300, Inc.*, 335 F.3d 633, 640 (7th Cir. 2003)).  The Court must "reject 'any subjective belief or speculation.'" *Id.* (quoting *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002) (citing *Porter v. Whitehall Labs., Inc.*, 9 F.3d 607, 614 (7th Cir. 1993)).

Under the second prong, the Court "evaluates the testimony's relevance." *Id.*  The opinion may assist the trier of fact with any issue involved in the case; the expert need not opine about the ultimate issue.  *See Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).  An expert may opine as to the hypothetical or probable causes of an event if such testimony would aid the jury. *Id.* at 718-19.  However, the hypothetical alternative must itself have an analytically sound basis such

11

that it is more than mere speculation. *Id.* at 719 (citing *DePaepe v. Gen'l Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998)). The Court may not decide if the expert's opinion is correct, rather it must only determine whether the expert's testimony is pertinent to an issue in the case. *Id.*

Alerding's opinions fails on both prongs. The problem with Alerding's assessment is that it anoints Fruth and Rogers experts in their fields without providing a basis for Alerding's expertise in making such an assessment, and it endorses Rogers' opportunity cost model based on the simple fact that it appears to use a formula that is acceptable for such calculations generally. There is nothing in Alerding's report or in his curriculum vitae from which the Court can conclude that Alerding has any experience in commercial real estate such that he can assess whether or not Fruth's and Rogers' assumptions are reasonable. Alerding admitted during his deposition that he is not an expert as to any of the underlying cost assumptions in Rogers' opportunity cost method. Alerding Dep. at 41-42. Furthermore, Alerding merely relies upon the fact that Fruth and Rogers have multiple years of experience in the industry to conclude that they must know what they are doing. *See* Alerding Rep. at 3. There is simply no basis from which the Court can conclude that Alerding has the background to opine on the subject matter of either Fruth and Rogers' expertise, or the subject matter of the opportunity cost model.

In addition, Alerding's conclusions are inherently inconsistent. In one paragraph he states:

The Opportunity Cost Calculation compares the hypothetical profit of selling the commercial building to the actual lease revenue earned. Through discussions with Mr. Fruth and Mr. Rogers, we have determined the underlying assumptions utilized to arrive at these values are reasonable. I have reviewed the assumptions used in the Opportunity Cost Calculation and believe they are reasonable based on my background as a business person, a business appraiser, and based on the qualifications of the people who created the calculation.

*Id.* However, in the next paragraph, he summarizes: "It is my opinion, subject to the verification of the amounts and concepts by the owners, the calculation of damages on the Opportunity Cost Calculation is reasonable." *Id.* Therefore, on the one hand Alerding concludes based on his experience that the assumptions and calculations are reasonable but, on the other hand, Alerding concludes that subject to verification by the very people who made the assumptions and calculations, the assumptions and calculations are reasonable. In short, Alerding concludes only that he would rely upon the owners for verification of the owners' analysis of their lost profits. Such testimony would not assist the trier of fact and without the proper qualifications to support Alerding's testimonial on behalf of the owners, any relevance of the opinion would be heavily outweighed by the danger of unfair prejudice.

In summary, Alerding's testimony and report cannot be considered because it does not meet the requirements of either Rule 702 or *Daubert* and its progeny. For this reason, Red Spot's Motion to Exclude Testimony of R. James Alerding is **GRANTED**.

### 2. Whether or Not 1100 West May Recover Lost Profit Damages

Turning now to the merits of Red Spot's Motion for Partial Summary Judgment, Red Spot asserts that 1100 West is not entitled to lost profit damages in a suit based on injury to property. In the alternative, Red Spot asserts that 1100 West's claim for such damages is based on evidence that is too speculative to be heard by a jury. In other words, Rogers' opportunity cost model is unreliable.

1100 West asserts that its claim for lost profits is based on injury to its business, not upon an injury to its property, therefore such damages are appropriate. Moreover, 1100 West contends that its opportunity cost model is based on reliable evidence provided by the owners, therefore, there

is enough evidence from which a jury could conclude that Rogers' opportunity cost model represents damages to which 1100 West is entitled.

The Court concludes that under the facts of this case, 1100 West is not entitled to recover lost profit damages. There are no Indiana cases directly on point, however, Indiana courts have held that lost profits are recoverable in tort actions, including those involving torts against property.[2]  *See Serletic v. Noel*, 700 N.E.2d 1159, 1162 (Ind. Ct. App. 1998); *Wolff v. Slusher*, 161 Ind. App. 182, 189-90, 314 N.E.2d 758, 763 (1974).  With respect to torts that affect the loss use of property, which is the case here, the *Wolff* court stated that "[w]hile rental value is the normal method of measuring value of loss use of property, . . . lost profits may be used as a measure where such profits are ascertainable with a reasonable degree of certainty."  *Wolff*, 314 N.E.2d at 763.  *See also Serlectic*, 700 N.E.2d at 1162 ("'When an established business is injured, interrupted, or destroyed, the measure of damages is the diminution in value of the business, with interest, by reason of the wrongful act.  The diminution may be measured by loss of profit.'") (quoting *Knauf Fiber Glass, GmbH v. Stein*, 615 N.E.2d 115, 128 (Ind. Ct. App. 1993), *aff'd in part, vacated in part on other grounds*).  In the case at bar, however, lost profit damages are not ascertainable with any degree of certainty, therefore, 1100 West's damages in tort are limited to the 1100 W. Property's fair rental

---

[2]In a case with similar facts to the one at bar in Georgia, it appears that economic loss would be recoverable by the owner of property damaged by environmental contamination.  *Gen. Elec. Co. v. Lowe's Home Ctrs., Inc.*, 608 S.E.2d 636, 638 (Ga. 2005) (stating that "[e]xisting case law makes clear that parties can recover in tort only for damage to their own property").  The issue in the *General Electric* case was "whether Georgia's economic loss rule allow[ed] a plaintiff to recover in tort lost profits that would have only been realized by using its damaged property *and* other damaged property that it did not own."  *Id.* at 637 (emphasis in original).  The Georgia Supreme Court answered that question in the negative.  *Id.*  In its analysis of this question, however, the Georgia Supreme Court implied that the aggrieved plaintiff could recover lost profit damages for injury to its own property, although it could not recover lost profits for injury to the property of a third party.  *Id.* at 638.

14

value.  *See Maddox v. Yocum*, 114 Ind. App. 390, 52 N.E.2d 636, 639 (1944).  The basis for 1100 West's lost profit damages is the profit from the sale of a hypothetical building to a hypothetical buyer.  Moreover, there are no actual quotations for the construction of the hypothetical building from which a jury could reasonably ascertain whether 1100 West was likely to have sold the building for the profit it claims it could have.  This is not a case where 1100 West had "a known and established business" where the value of the lost use of the property could be shown with a reasonable degree of certainty from historical records.  *Id.*  In this case, historical records point to values of other property, which has only tangential relationship to the property at issue. Under this circumstance, a jury could not ascertain with reasonable certainty 1100 West's lost profits with respect to the 1100 W. Property.

For these reasons, Red Spot's Motion for Partial Summary Judgment is **GRANTED**.

## B.  1100 WEST'S MOTION FOR PARTIAL SUMMARY JUDGMENT & RELATED MOTIONS

1100 West has moved for partial summary judgment on Counts II and III of Red Spot's First Amended Complaint.  The Court addresses each of 1100 West's arguments in turn.

### 1.  Count II:  Citizen Suit under Indiana Code § 13-30-1-3

1100 West asserts that Red Spot's counterclaim under Indiana Code § 13-30-1, the citizen suit provision of Indiana's environmental laws, fails because Red Spot does not meet the statutory requirements for such a suit under Indiana Code § 13-30-1-3, since IDEM initiated an administrative proceeding against 1100 West on September 15, 2006, when it issued the PRP letter.  Even if the

Court determines that the PRP letter does not meet the statutory bar in Indiana Code § 13-30-1-3, 1100 West asserts that this Count fails because 1100 West did not cause the contamination at issue in that claim.

In contrast, Red Spot contends that the PRP letter is not an "administrative proceeding" as that term is used in Indiana Code § 13-30-1-3, therefore, it did not act to bar Red Spot's citizen suit against 1100 West. Specifically, Red Spot asserts that an administrative proceeding must at least comport with the requirements of Indiana's Administrative Orders & Procedures Act ("AOPA"), Indiana Code § 4-21.5, which requires that to issue a sanction, an agency must conduct a proceeding as required therein. Ind. Code § 4-21.5-3-8. According to the statutes, Red Spot argues, a proceeding is commenced when an agency issues an order that imposes a sanction, which is more than a request to perform an investigation to characterize the contamination on a piece of property. *See* Ind. Code §§ 4-21.5-3-6 & 4-21.5-1-9. Moreover, with respect to the merits of its citizen's suit, Red Spot asserts that its expert's testimony establishes a material question of fact on whether 1100 West's failure to act caused damage to Red Spot's property.

The Court agrees with 1100 West that Count II of Red Spot's First Amended Complaint brought under Indiana Code § 13-30-1 is barred by the statutory requirements of Indiana Code § 13-30-1-3. The Court notes at the outset that there is no Indiana case directly on point. Therefore, the Court starts with the language of the pertinent statute. Section 13-30-1-3 provides:

> Sec. 3. (a) An individual or entity . . . that brings an action under section 1 of this chapter may not maintain the action unless:
>
> > (1) none of the agencies that receives notice of the action under section 2 of this chapter:

16

> (A) commences an administrative proceeding or a civil action on the alleged pollution, impairment, or destruction not later than ninety (90) days after receiving notice under section 2 of this chapter; or
>
> (B) takes steps not later than ninety (90) days after receiving notice under section 2 of this chapter to have a criminal prosecution commenced on the alleged pollution, impairment, or destruction; or
>
> (2) the agency that commences an administrative proceeding or a civil action on the alleged pollution, impairment, or destruction does not diligently pursue the administrative proceeding or civil action under the administrative proceeding or civil action is commenced.

Ind. Code § 13-30-1-3(a). The Court concludes that the term "administrative proceeding" in this statute is ambiguous because both parties have provided plausible interpretations for the term. *See Med. Assurance of Ind. v. McCarty*, 808 N.E.2d 737, 741 (Ind. Ct. App. 2004) (citing *Robinson v. Gazvoda*, 783 N.E.2d 1245, 1250 (Ind. Ct. App. 2003)). Therefore, the Court must seek to "determine, give effect to, and implement the legislative intent underlying the statute and to construe the statute in such a way as to prevent absurdity and hardship and to favor public convenience." *Bushong v. Williamson*, 790 N.E.2d 467, 471 (Ind. 2003)). The Court must "consider the objects and purposes of the statute as well as the effects and repercussions of [its] interpretation." *Id.* Moreover, "[t]he legislative intent as ascertained from the provision as a whole prevails over the strict literal meaning of any word or term." *Id.*

As the Court has already implied, Red Spot's argument that the *in pari material* rule compels a conclusion that an administrative proceeding must be as formal as a "civil action" is plausible. Particularly when the civil penalties portion of the environmental code to which the PRP letter refers states that an entity is liable for such penalties if it violates "any determination, permit, or order made or issued by the commissioner . . . ." Ind. Code § 13-30-4-1. But, Indiana courts have not been

completely silent about what type of administrative action is necessary to be considered a "suit," which is clearly the equivalent of a "civil action." In *Hartford Accident & Indemnity Co. v. Dana Corp.*, 690 N.E.2d 285 (Ind. Ct. App.), the Indiana Court of Appeals determined that a potentially responsible party letter received from the United States Environmental Protection Agency ("EPA"), was a "suit" under the policy, which triggered the insurance company's duty to defend. *Id.* at 296. The *Dana* court reasoned that the potentially responsible party letter in that case had the necessary "'cognizable degree of coerciveness or adversariness [sic]'" to be considered a "suit" that triggered the insurance company's duty to defend. *Id.* (quoting *Ryan v. Royal Ins. Co.*, 916 F.2d 731, 738 (1st Cir. 1990) (applying New York law)). Like the PRP letter in the instant case, the potentially responsible party letter in *Dana* specifically identified the corporation as a potentially responsible party and requested the corporation to submit a proposal for remedial action. *Id.* The *Dana* letter also threatened issuance of an administrative order if the corporation did not comply with the EPA's request for cooperation. *Id.* These factors, the *Dana* court reasoned, compelled a conclusion that the PRP letter was the equivalent of a "suit" because "[t]o decide otherwise would encourage insureds to not cooperate with governmental agencies, thus running the risk of huge fines, punitive damages, and delay in remediating environmental pollution." *Id.* The *Dana* court did comment, however, that "mere notification or investigation when no enforcement action is contemplated" would not rise to level of a "suit" because they were not coercive enough. *Id.* at 296-97.

The holding in *Dana* certainly indicates that an Indiana Court is likely to find an administrative proceeding is something less than a formal administrative hearing under the AOPA. In all likelihood, an Indiana court would likely apply the same standard as the *Dana* court to determine when an administrative proceeding had commenced: an entry-level cognizable degree of

18

coerciveness or adversariness.   Such a standard comports with the policy behind Indiana's environmental statutes, which the Indiana legislature articulated, in part, as:

> (2) to unify, coordinate, and implement programs to provide for the most beneficial use of the resources of Indiana; and

> (3) to preserve, protect, and enhance the quality fo the environment so that, to the extent possible, future generations will be ensured clean air, clean water, and a healthful environment.

Ind. Code §§ 13-12-3-1(2) & (3).   These policy goals can only be effectuated if the statutes that implement these goals make it easier for the state environmental agency to do its job and if the courts interpret them in such a way to encourage voluntary remediation.   Concluding that an administrative proceeding is nothing short of an enforcement order would contravene these policies.   In effect, it would force a potentially responsible party to ignore a state agency request and be faced with actual civil penalties under Indiana Code § 13-30-4-1 before IDEM's actions could bar a citizen suit.   Such an outcome would encourage litigation over voluntary compliance and cooperation.   The Court cannot agree that an Indiana court would foster such an outcome.

It is for these reasons that the Court concludes that and Indiana Court would consider the PRP letter in this case, like that in the *Dana* case, to have an entry-level cognizable degree of coerciveness such that it is an administrative proceeding that would bar a citizen's suit against 1100 West in this case.   1100 West's Motion for Partial Summary Judgment on Count II of Red Spot's First Amended Complaint is **GRANTED**.

## 2.  Count III:  Environmental Legal Action under Indiana Code § 13-30-9-2

Under Indiana Code § 13-30-9-2, an entity "may bring an environmental legal action against a person who caused or contributed to the release [of a hazardous substances] to recover reasonable costs of a removal or remedial action involving the hazardous substances . . . ."  1100 West contends that Red Spot can produce no evidence from which a jury could conclude that 1100 West "caused or contributed to the release" of the TCE on the 1100 W. Property.  1100 West asserts that the TCE contamination did not result from any action taken by 1100 West, therefore, under either Indiana Code § 13-30-9-2 or § 13-30-1-3, 1100 West cannot be liable for that contamination.

Red Spot contends that 1100 West knew about trace amounts of TCE on the 1100 W. Property prior to 1991, but 1100 West failed to take steps to determine the extent of the contamination or to remediate it once it bought the property.  In essence, Red Spot asserts that by its inaction 1100 West caused or contributed to the release of the TCE and a jury could so find.

The term "caused or contributed" is not defined in Indiana's environmental statutes. Therefore, the Court must turn again to Indiana's rules of statutory construction.  Generally,

> the express language of the statute controls the interpretation and the rules of statutory construction apply. [The] Court is required to determine, give effect to, and implement the legislative intent underlying the statute and to construe the statute in such a way as to prevent absurdity and hardship and to favor public convenience. . . . The legislative intent as ascertained from the provision as a whole prevails over the strict literal meaning of any word or term.

*Bushong*, 790 N.E.2d at 471 (citations omitted).  In another case in the Southern District of Indiana, this Court was called upon to interpret the phrase "caused or contributed to" and determined that the dictionary definitions of the relevant terms applied.  *City of Martinsville v. Masterwear Corp.*, No. 1:04-cv-1994-RLY-WTL, 2006 WL 2710628, at *4 (S.D. Ind. Sept. 20, 2006).  Specifically, the

20

Court concluded that "the phrase 'caused or contributed' requires some involvement by the actor which produces a result." *Id.* The Court sees no reason to vary from this plain meaning definition for the phrase "caused or contributed" in this case.

Applying the term to the facts here, the Court agrees with 1100 West that there is no evidence from which the jury could conclude that 1100 West "caused or contributed to" the TCE contamination on the 1100 W. Property. There is no dispute that 1100 West had the property tested for contamination in 1989 before it purchased the 1100 W. Property. Fruth Dep. Ex. 101; Keramida Aff. ¶ 1. It is likewise undisputed that the TCE contamination found at the site in that initial evaluation was below the then-applicable standard that would trigger a duty to remediate the property. Rogers Supp. Aff. ¶¶ 5-7; Rogers Dep. at 125; Feenstra Dep. at 84-85, 88-89; Keramida Aff. ¶¶ 1, 3(b) & (c). Further, after 1100 West purchased the property it received another environmental report that indicated no groundwater remediation was necessary. Rogers Supp. Aff. ¶¶ 6, 7. Moreover, Red Spot has failed to come forth with evidence to contradict Fruth and Rogers' assertion that no entity with which 1100 West has associated used any TCE or caused any TCE to be dumped at the 1100 W. Property. *See* Feenstra Dep. at 37 (answering no to the question "Are you aware of any evidence that there were releases of TCE after 1991?"); *see also* Rogers Supp. Aff. Ex. B, at ¶¶ 1.0, 7.3 (a Phase I Environmental Assessment dated June 25, 1993, concluding that the 1100 W. Property "had no apparent environment defects at the time of [that] assessment").

Red Spot asks that the Court abstain from ruling on the instant motion under Rule 56(f) and allow Red Spot to conduct additional tests, however, as indicated in 1100 West's reply brief, the additional testing has already been performed and Red Spot's expert testified that it is "most probably that releases commenced before 1991 . . . ." *Id.*

21

For these reasons the Court **GRANTS** 1100 West's Motion for Partial Summary Judgment on Count III of Red Spot's First Amended Complaint.  The nature of the Court's decision made it unnecessary to reach the issues raised in Red Spot's Motion to Limit Expert Testimony of Vasiliki Keramida, Ph.D. (Docket No. 234), Red Spot's Motion to Exclude and/or Strike Rebuttal Opinions and Report of Vasiliki Keramida, Ph.D. (Docket No. 236), 1100 West's Motion to Exclude Expert Testimony and Report of Stanley Feenstra and Paul Troy (Docket No. 238) and 1000 West's Motion to Strike Section C of Surreply (Docket No. 217).  Said motions are **DENIED as MOOT**.

## IV.  CONCLUSION

For the reasons stated herein, the Court **GRANTS** plaintiff's, 1100 West , LLC, Motion for Partial Summary Judgment (Docket No. 120); and **GRANTS** defendant's, Red Spot Paint and Varnish Co., Inc., Motion for Partial Summary Judgment (Docket No. 131).  In addition, the Court: **DENIES as MOOT** 1100 West, LLC's, Motion to Exclude Expert Testimony and Report of Stanley Feenstra and Paul Troy (Docket No. 238); **DENIES as MOOT** 1100 West, LLC's, Motion to Strike Section C of Surreply (Docket No. 217); **GRANTS** Red Spot Paint and Varnish Co., Inc.'s, Motion to Exclude Testimony of R. James Alerding (Docket No. 232); **DENIES as MOOT** Red Spot Paint and Varnish Co., Inc.'s, Motion to Limit Expert Testimony of Vasiliki Keramida, Ph.D. (Docket No. 234) ; **DENIES as MOOT** Red Spot Paint and Varnish Co., Inc.'s, Motion to Exclude and/or Strike Rebuttal Opinions and Report of Vasiliki Karamida, Ph.D. (Docket No. 236).

IT IS SO ORDERED this 4th day of March, 2008.


LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana


Distribution attached.

23

Electronically distributed to:

Thomas A. Barnard
SOMMER BARNARD ATTORNEYS, PC
tbarnard@sommerbarnard.com

Lewis Daniel Beckwith
BAKER & DANIELS
lew.beckwith@bakerd.com

Jayna Morse Cacioppo
SOMMER BARNARD ATTORNEYS, PC
jcacioppo@sommerbarnard.com

Robert Ballard Clemens
BOSE MCKINNEY & EVANS, LLP
rclemens@boselaw.com

Amy L. Cueller
BOSE MCKINNEY & EVANS, LLP
acueller@boselaw.com

Beth S. Gotthelf
BUTZEL LONG
gotthelf@butzel.com

James Patrick Hanlon
BAKER & DANIELS
jphanlon@bakerd.com

Richard A. Kempf
SOMMER BARNARD ATTORNEYS, PC
rkempf@sommerbarnard.com

Patrick Michael Miller
DREWRY SIMMONS VORNEHM, LLP
pmiller@drewrysimmons.com

Janet Halline Nelson
BOSE MCKINNEY & EVANS, LLP
jnelson@boselaw.com

Peter Jon Prettyman
SOMMER BARNARD ATTORNEYS, PC
pprettyman@sommerbarnard.com

David Joseph Tipton
SOMMER BARNARD ATTORNEYS, PC
dtipton@sommerbarnard.com

Richard S. VanRheenen
BOSE MCKINNEY & EVANS, LLP
rvanrheenen@boselaw.com

Todd A. Weaver
SOMMER BARNARD ATTORNEYS, PC
tweaver@sommerbarnard.com

24