UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| 1100 WEST, LLC, | ) | |
|       Plaintiff, | ) | |
| | ) | |
|   vs. | ) | 1:05-cv-1670-LJM-JMS |
| | ) | |
| RED SPOT PAINT & VARNISH CO., INC., | ) | |
|       Defendant. | ) | |

## ORDER ON PLAINTIFF'S MOTION FOR SANCTIONS

This cause is now before the Court on plaintiff's, 1100 West, LLC, Motion for Sanctions (Docket No. 448) against defendant, Red Spot Paint & Varnish Co., Inc. ("Red Spot"), and Red Spot's former attorneys, Bose McKinney & Evans, LLC ("BME"). 1100 West alleges that Red Spot and its attorneys purposely withheld documents that were responsive to discovery requests; that Red Spot, through its Federal Rule of Civil Procedure 30(b)(6) ("Rule 30(b)(6)") witness, Susan Henry ("Henry"), lied or misrepresented the truth about Red Spot's use of trichloroethylene ("TCE") and tetrachloroethylene (also known as "perchloroethylene", herein "PCE"); and that other Red Spot employees, including former Red Spot President and Chairman of the Board, Charles Storms ("Storms"), lied or misrepresented the truth about Red Spot's use of the chlorinated solvents. 1100 West argues that the pervasiveness of Red Spot's discovery abuses deserves the most draconian of sanctions: default judgment, striking of experts, and an award of attorneys' fees and costs.

Red Spot denies that it purposefully withheld documents, or that, through Henry or Storms, it lied about its use of either TCE or PCE on its property. In addition, Red Spot contends that it relied on its attorneys, BME, for advice in discovery; therefore, any error

or failure to produce documents is BME's responsibility.  Finally, Red Spot contends that, on the merits, the evidence that was not produced is not material to the issue of whether the TCE contaminated plume on 1100 West's property originated on Red Spot's property.

BME asserts that its attorneys, Amy Cueller ("Cueller") and Richard VanRheenen ("VanRheenen"), were not aware of what it calls "the fourteen critical documents" that evidence the use of both TCE and PCE on Red Spot's property and were not aware of the extent to which or the time frame during which those chemicals were on the property.  In addition, BME argues that Red Spot admits that BME relied upon Red Spot to provide accurate, truthful and complete information, but Red Spot did not do so.  BME does not dispute that some documents that were in BME's possession were relevant and responsive to discovery requests.  However, BME asserts that once the firm knew of the potential misconduct of attorneys, Cueller and VanRheenen, it promptly took steps remove those lawyers from the firm and cooperated fully with 1100 West.  BME urges the Court to focus on the failure of Red Spot to be candid throughout this litigation about its use of TCE and PCE on its property.

On May 6 and 7, 2009, the Court held a hearing on this matter because of the seriousness of 1100 West's allegations.  Now, having considered the parties' briefs and the evidence contained therein, the testimony and evidence presented at the hearing, and the arguments of counsel, for the reasons stated herein, the Court **GRANTS** 1100 West's Motion for Sanctions.

# I. **FACTUAL BACKGROUND**

## A. **PROCEDURAL HISTORY OF THE DISPUTE**

Prior to August 2003, Red Spot had retained Kathleen Lucas ("Lucas"), a partner at BME, to enroll its property in the Indiana Department of Environmental Management's ("IDEM's") voluntary remediation program ("VRP"). (Lucas Dep. at 12.)  On August 1, 2003, 1100 West filed a lawsuit in Indiana state court ("state court suit") alleging, among other things, that Red Spot's paint manufacturing operations had contaminated 1100 West's property with the following chemicals:  heptane, 2-methyl; toluene; xylene; ethylbenzene; 1,2,4-trimethylbenzene; heptane, 3-ethyl-2-methyl; cyclohexane, 1,1,2,3-tetramethyl - lindane; benzene; and napthalene. (*1100 West, LLC v. Red Spot Paint & Varnish Co., Inc.*, Cause No. 82D03-0308-PL-003333, (Vanderburgh Superior Court, Ind.), Compl. for Damages & Injunctive Relief, ¶ 9.)  At that time, Lucas tapped her partner, VanRheenen, to act as the lawyer primarily responsible for the litigation. (Lucas Dep. at 18.)  VanRheenen had nearly twenty years of experience, primarily concentrating in environmental law, and had more experience with litigation than Lucas. (VanRheenen Dep. at 171-74.)  When he got involved in the case, VanRheenen represented himself to Red Spot as someone who had the background and experience to handle that case. (*Id.* at 175.)  Until Cueller got involved, VanRheenen functioned as the primary litigator on the case. (*Id.* at 28-29.)

On or about October 3, 2003, Red Spot received 1100 West's first set of interrogatories ("2003 Interrogatories") and 1100 West's first request for production of documents ("2003 Request for Production") (collectively, "2003 Discovery Requests"). (Pl.'s Exs. 18 & 20.)  The 2003 Interrogatories inquired about the name of and address of

each supplier to Red Spot's facility, since 1985; and, for each supplier identified, the interrogatories required Red Spot to identify the products supplied by each supplier, and the dates such products were supplied.  (Pl.'s Ex. 18, Interrog. Nos. 4 & 5.)  That same set of interrogatories asked Red Spot to identify all chemicals used in its manufacturing process; to identify the amount of hazardous material, as defined by Indiana Code § 13-11-2-96, generated each year, beginning in 1985, including the method to determine the amount; and to identify the amount of hazardous waste, as defined by Indiana Code § 13-11-2-99, generated each year, beginning in 1985, including the method to determine the amount.  (*Id.* Interrog. Nos. 8, 23, & 24.)  Similarly, 2003 Request for Production No. 5 stated, "All documents relating to the formulation of all chemicals held, stored, or used in the Manufacturing process at the Facility from 1985 through present."  (Pl.'s Ex. 20, Req. for Prod. No. 5.)

According to Henry's March 4, 2009, deposition testimony, after Red Spot received 1100 West's First State Discovery Requests, she examined sixty-eight boxes and two filing cabinets of environmental documents stored in the basement of Building 3 on Red Spot's property.  (Henry, Mar. 4, 2009, Dep. at 61, 68-69.)  Other than marking some boxes with a Sharpie to identify, generally, what the box contained, Henry did not otherwise organize, catalog, index or tabulate the information in the sixty-eight boxes and two filing cabinets.  (*Id.* at 83.)

On or about December 22, 2003, Red Spot answered the 2003 Interrogatories.  (Pl.'s Ex. 19.)  Red Spot objected to requests 4 and 5, which requested the names of suppliers, the products each supplied, and the dates upon which the product was supplied.  (*Id.* Ans. to Interrog. Nos. 4 & 5.)  Specifically, Red Spot objected on the basis that the

4

information was irrelevant and that the request was unduly burdensome because of the eighteen-year time frame. (*Id.*) Red Spot made similar objections to the interrogatory directed to chemicals used in the manufacturing process and to the two interrogatories directed to the amount of hazardous waste generated at the facility and the method used to make the classification determination. (*Id.* Ans. to Interrog. Nos. 8, 23, 24.)

Apparently, as part of its responses to 1100 West's request for production of documents, Red Spot did produce a letter dated December 21, 1989, from then Red Spot Manager of Environmental and Safety Affairs, Matt deHeus, to IDEM. (Pl.'s Ex. 21.) In the letter, deHeus discussed the sampling data from the closure of two underground storage tanks ("USTs") on the Red Spot property. (*Id.*) deHeus reported that Red Spot had two different companies sample the UST pit. (*Id.*) The first company reported that the soil contained five organic solvent compounds. (*Id.*) The first company's results were attached to the letter and reported that the sample taken contained 323 parts per billion ("ppb") of PCE, among other organic materials. (*Id.*) deHeus reported that the second company's results showed small contaminations of 1,1,1-trichloroethane ("TCA"), trichloroethene (or TCE), and PCE. (*Id.*)

In a May 26, 2006, Remediation Work Plan, apparently submitted by Red Spot to IDEM, Red Spot reported that in May 2005, it had detected the presence of TCE on 1100 West's property at 10.9 parts per million ("ppm"), which was a concentration higher than that on the upgradient Red Spot property. (Red Spot Ex. 7, at RS016878.) Specifically, the high reading was found on the 1100 West site in groundwater monitoring well 19 ("GWM-19").

On November 7, 2005, 1100 West filed the instant action.  1100 West filed an Amended Complaint on May 12, 2006.  In its Amended Complaint, 1100 West makes similar allegations to those in its state court suit; however, it seeks injunctive relief under the Resource Conservation and Recovery Act ("RCRA"), and it alleged potential other contaminants from the UST pit, including TCE.  In its Answer to 1100 West's Amended Complaint, Red Spot admitted that "upon the written agreement of Red Spot, 1100 West is consolidating into this action its State Action claims."  (Am. Compl. ¶ 36; Ans. to Am. Compl. ¶ 36.)

On March 1, 2006, 1100 West served its first set of interrogatories in this suit on Red Spot.  (Pl.'s Ex. 16.)  Instruction 12 to this set of interrogatories stated:  "Unless a different time period is identified in the interrogatory, each interrogatory refers to the time period from January 1, 1986, to the present."  (*Id.*)  Interrogatory No. 4 reads:  "State whether Red Spot used or stored the chemical trichlorethylene (TCE) at the Red Spot [Evansville] Property at any time, whether as a substance or a constituent of a substance."  (*Id.* Interrog. No. 4.)  Red Spot's answer to this interrogatory stated, "Objection.  The phrase 'constituent of a substance' is vague and calls for speculation on the part of [Red Spot] as to what [1100 West] is contemplating in that respect.  Subject to its objection, no."  (Pl.'s Ex. 17.)

On April 12, 2007, 1100 West presented its Sixth Request for Production of Documents to Defendants.  (Pl.'s Ex. 65.)  Request number 7 therein requested "all documents, including but not limited to material safety data sheets . . . relating to the type and quantity of chemicals held, stored or used at the Evansville Property . . . that are <u>not</u>

used in the Manufacturing process but for any other use . . . from the period of 1985 through the present."  (*Id.* Request No. 7.)

In July 2007, Red Spot moved to exclude or strike the rebuttal opinion of 1100 West's expert, Dr. Vasiliki Keramida ("Dr. Keramida"), and to limit her testimony.  (Docket Nos. 234 &236.)   In essence, Red Spot argued that the Court should exclude Dr. Keramida's opinions regarding the migration of TCE and PCE from Red Spot's property to 1100 West's property because it was based on speculation.  (Docket No. 235, at 10.) Specifically, Red Spot argued that Dr. Keramida could not point to a document or testimony to support her hypothesis that Red Spot used TCE in a parts washer.  (*Id.* at 9-12.)  Red Spot criticized Dr. Keramida for ignoring Henry's February 8, 2006, Rule 30(b)(6) deposition testimony that Red Spot did not use TCE on its property as a constituent of a raw material or have that material in its waste.  (*Id.* at 10-11 (citing Henry, Feb. 8, 2006, Dep. at 225, 235, 308).)   Red Spot also criticized Dr. Keramida for not even reading de Heus' testimony, who, as former environmental manager, had responsibility for the removal of the UST, in which he stated that Red Spot's wash-up solvent mirrored the solvents in Red Spot's paint products, which were acetone, methyl-ethyl ketone ("MEK"), butyl acetate, methylene chloride, butanol, and MIBK.  (*Id.* at 11 (citing deHeus, July 24, 2006, Dep. at 80-81, 116-17).)

On August 28, 2008, the Court ordered the parties to supplement their discovery responses:  "Both parties are **ORDERED** to produce any other supplemental discovery that is responsive to any and all discovery requests of the other party, or regarding the parties' experts by September 5, 2008."  (Docket No. 342, at 5.)

On September 26, 2008, consistent with the Case Management Plan ("CMP") in this cause, Red Spot filed its Proposed Findings of Fact. (Docket No. 382.) Therein, Red Spot stated: "Red Spot's operations have not included the use of trichloroethylene ("TCE") or tetrachloroethene ("PCE"), both chlorinated solvents." (*Id.* ¶ 9.) And, "Neither TCE or [sic] PCE have [sic] ever been constituents of Red Spot's manufacturing processes or of its wash-up solvent." (*Id.* ¶ 10.) On the same date, September 26, 2008, Red Spot filed its Amended Trial Brief. (Docket No. 384.) Therein, Red Spot stated: "[T]here is no evidence that Red Spot ever used TCE or [PCE], both chlorinated solvents, in its operations." (*Id.* at 5.)

On October 6, 2008, the Court denied Red Spot's motion to limit the testimony of Dr. Keramida and denied Red Spot's motion to exclude or strike her rebuttal opinions. (Docket No. 406.)

On October 8, 2008, the Court issued an order that sustained in part, overruled in part, and took under advisement in part Red Spot's objections to 1100 West's deposition designations; sustained in part, overruled in part, and took under advisement in part Red Spot's objections to 1100 West's exhibit list; sustained in part, overruled in part, and took under advisement in part 1100 West's objections to Red Spot's exhibits; mooted in part, granted in part, and denied in part 1100 West's motion to strike certain Red Spot witnesses; granted 1100 West's motion to strike inappropriate disclosure of settlement negotiations and motion to exclude evidence of settlement negotiations; granted 1100 West's motion for judicial notice and denied 1100 West's motion for sanctions regarding Red Spot's failure to disclose certain test data. (Docket No. 416.)

On October 9, 2008, the Court held a Final Pre-Trial Conference with the parties and resolved the majority of the outstanding evidentiary issues prior to trial.  (Docket No. 419; *see also* Docket No. 431, Final Pre-Trial Conf. Tr.)  The Court confirmed the Bench Trial date of October 20, 2008.  (*Id.*)

On October 14, 2008, 1100 West filed a Motion for Emergency Attorneys' Conference.  (Docket No. 424.)  Therein, 1100 West related to the Court that, because Red Spot had refused to stipulate to the authenticity of third-party records in Red Spot's possession, including documents generated by the U.S. Environmental Protection Agency ("EPA"), 1100 West had made a Freedom of Information Act ("FOIA") request to the EPA to obtain a certified copy of Red Spot's EPA RCRA file.  (*Id.* ¶ 3.)  On Friday, October 10, 2008, 1100 West received said certified copy of the file.  (*Id.* ¶ 4.)  Upon review of the EPA file, 1100 West discovered several documents that 1100 West considered responsive to its discovery requests that Red Spot had not produced.  (*Id.* ¶ 5.)  These documents included:  numerous documents that indicated RCRA violations at the Red Spot facility, including photographs of leaking solvent waste drums; an EPA memo stating that Red Spot had consistently failed to demonstrate a good faith effort toward compliance; and a hazardous waste manifest for Red Spot's waste thinners showing TCE as part of the analyzed waste solvent.  (*Id.*)  Extrapolating the concentration of TCE in the waste stream, 1100 West alleged that the EPA file hazardous waste manifest indicated that Red Spot generated over ninety-six gallons of TCE in a truckload of its liquid waste.  (*Id.* ¶ 7.)  In addition, 1100 West informed the Court that it had learned through the EPA that, on August 2, 2007, Red Spot's counsel, BME, had received a copy of the same Red Spot EPA RCRA file that 1100 West had just received.  (*Id.* ¶ 11.)  1100 West requested an

9

attorneys' conference to address the timing of the trial and a briefing schedule for 1100 West's sanctions motion related to the information withheld from 1100 West, and the misrepresentations made to the Court based on the newly-discovered information.  (*Id.* ¶ 20.)  Included with 1100 West's motion was a copy of a facsimile from the EPA confirming that BME had received the EPA RCRA file in August 2007.  (*Id.* Ex. J.)

By Order dated October 15, 2008, the Court granted 1100 West's Motion for Emergency Hearing, setting the same for October 15, 2008, at 3:00 p.m.  (Docket No. 425.)

At the October 15, 2008, Hearing, 1100 West presented evidence that on the morning of October 14, 2008, before it filed its motion for an emergency hearing, it had inquired of BME whether anyone on behalf of Red Spot had requested the Red Spot EPA file.  (Emergency Hr. Ex. P2.)  BME responded, "We have not seen any such file."  (*Id.*)  In addition, 1100 West presented to the Court the documents from the EPA RCRA file that 1100 West thought were material to the issue of whether Red Spot had ever used, stored, or disposed of TCE or PCE on its property.

Then, VanRheenen, on behalf of Red Spot, indicated that a paralegal who primarily worked for him made a FOIA request for the EPA RCRA file in June 2007, and that BME had received documents from EPA in response to that request.  (Oct. 15, 2008, Hr'g Tr. at 3.)  VanRheenen stated that the documents BME received did not contain any of the documents that were the subject of 1100 West's motion.  (*Id.*)  VanRheenen went on to state that BME had prepared witnesses to testify and that BME had answered interrogatories to the effect that no TCE had ever been on the property, and this was consistent with BME's copy of the EPA RCRA file.  (*Id.* at 4-5.)  VanRheenen presented

a set of documents to the Court, which the Court later marked as Exhibit D1, that VanRheenen stated were the only documents BME received when BME made its FOIA request.  (*Id.* at 3.)  VanRheenen also suggested that at the time BME received the documents, August or September 2007, he had been experiencing some health issues and that the EPA RCRA documents in its possession "were actually . . . forgotten documents to us until [1100 West's] motion and [Cueller] and I went through them last night."  (*Id.* at 6-7.)  At that hearing, it was clear that one of the most damaging documents in the file, a waste manifest, Bates No. U.S. EPA 517, was not in what was later marked as Red Spot's exhibit D1.  (*Id.* at 13.)

VanRheenen stated that until the night before, he did not think he had ever gone through the documents.  (*Id.* at 14.)  Cueller stated that she had

> never gone through these documents.  [She] was not aware that they had been requested and that [BME] had received them; as Mr. Van Rheenen explained, it appear[ed] that they came in during a period of time that he was having some health issues.  He was then out of the office for a lengthy period of time.  The best that [BME] could surmise [the night before] as [counsel] looked through [the] documents for the first time is that they were put into files and stuck into the Red Spot file room because it was a surprise to [counsel] when [they] received the motion [the night before] that [BME] had made a request.

(*Id.* at 15.)  To the Court's inquiry about whether BME counsel knew that the EPA had a file on Red Spot, Cueller responded:  "Your Honor, that was not a consideration that I had ever made in this case. . . .  I'm not an environmental lawyer.  I'm a litigator.  So no, sir."  (*Id.*)

Regardless of whether counsel remembered requesting his paralegal to make a FOIA request, VanRheenen testified that he could "say for certain that we did not get those documents" discussed by 1100 West's emergency motion.  (*Id.* at 16.)

11

1100 West then catalogued other relevant documents contained in the EPA RCRA file that it believed were contained in the set of documents later marked as Exhibit D1 and were relevant to the issues in the case.  Namely, documents with the following Bates Nos.: U.S. EPA 319, showing spent solvent waste; U.S. EPA 337, a notice of a violation to Red Spot stating that there was evidence of fire, explosion or release of hazardous waste or hazardous waste constituents on the premises that could threaten human health or the environment; U.S. EPA 394, a document that observed that Red Spot had not managed hazardous waste in a manner that would prevent threats to human health or the environment; and U.S EPA 580, a document that 1100 West alleges bears on the issue of Red Spot's corporate attitude toward environmental compliance.  (*Id.* at 18-19.)

At that point, VanRheenen represented to the Court that only two of nineteen waste manifests in the Red Spot EPA RCRA file showed the presence of TCE, and such a fact suggested that the manifest might show a false result for TCE because TCE is often mistaken with TCA in chromatographic analyses.  (*Id.* at 20-21.)  VanRheenen also suggested that, on the merits, the EPA RCRA documents proved very little, particularly in light of a 1991 EPA site visit that uncovered none of the problems alluded to by 1100 West.  (*Id.* at 21-22.)

1100 West then indicated to the Court that it was prejudiced by the late discovery of these documents with trial set to begin the following Monday.  (*Id.* at 23.)

Red Spot encouraged the Court to go forward with the trial on Monday:

We didn't do anything wrong.  We didn't withhold any documents that we shouldn't have we don't believe.  We certainly didn't have these manifests and laboratory analysis sheet.  Let Dr. Keramida testify that she thinks this adds to her opinion that there was TCE in the wash-up solvent.

> In our view, that has always been a bit of a red herring anyway. There's always been TCE in the groundwater at Red Spot. There is still no good scientific basis that Dr. Keramida has ever presented that would establish how you go from low concentrations of TCE in the groundwater at the Red Spot site to the massive concentrations that are present at the 1100 West site.
>
> If she thinks this bolsters her opinion that, well, it was present in the wash-up solvent, that still doesn't change any of the data that need to be analyzed by the experts at trial on how did anything migrate from Red Spot to the 1100 West site and how do you explain the high concentrations of TCE at the Red Spot — 1100 West site.

(*Id.* at 23-24.)

The Court concluded that both 1100 West and Red Spot needed more time to evaluate what had occurred vis-a-vis the two EPA RCRA files and whether or not the EPA RCRA file documents referenced by 1100 West would effect the merits of the case. (*Id.* at 25-26.) The Court continued the trial to January 12, 2009, and asked the parties to work out a discovery schedule. (*Id.* at 26-27).

The next day, October 16, 2008, BME notified the Court that it had located other EPA RCRA documents and needed another hearing; the Court set the matter for another hearing on October 17, 2008. (Docket Nos. 427, 428.)

At the October 17, 2008, hearing, Cueller indicated that two documents from the EPA RCRA file that reflected the presence of TCE were not signed by Red Spot personnel and that there was a very legitimate question as to whether or not they were even Red Spot's records. (Oct. 17, 2008, Hr'g Tr. at 3.) VanRheenen then disclosed that BME had in its possession the documents VanRheenen had represented were not contained in BME's copy of the EPA RCRA file; BME had found them the day before. (*Id.*) Specifically, VanRheenen stated:

> The first place we found them was by looking at the Summation database.
> And then in the course of trying to find what happened to the paper, then we
> found the paper documents.  And it appears the paper documents had been
> in the original files.  And in going through these the other night we didn't – we
> misplaced that particular stack that contained those documents among all
> the clutter in that room.

(*Id.* at 4.)  Apparently, the documents had been clipped together and VanRheenen set

them aside, but never went back to them when BME was doing its review on the evening

of October 15, 2008.  (*Id.* 5-6.)  BME presented to the Court the misplaced stack of

documents; the Court later marked this set of documents as Exhibit D2.

In addition, BME presented to the Court its time records for the period in which the

original FOIA request had been made, which the Court later marked as Exhibit D3.  (*Id.* at

7-8.)  Those records indicate that a paralegal emailed VanRheenen and Matthew Klein

("Klein"), a BME associate, formerly with IDEM, in June 2007 to inquire about whether she

should make a FOIA request.  VanRheenen replied, "Yes." Cueller replied, "Agreed."  Once

the EPA RCRA file came in, Klein reviewed the record and pulled certain records from the

stack to put in front of VanRheenen.  (*Id.* at 8.)  The records then indicated that

VanRheenen spent 0.4 hours reviewing those records.  (*Id.* at 8-9.)  Cueller states:

> And at that point, Your Honor, I don't know how clued in that particular
> associate was in terms of the issues of the case.  But what it appears
> happened is that the associate then put these documents in to a file and
> hand delivers them or delivers them to Mr. VanRheenen.  He spends [0].4
> going through these documents, which don't contain the TCE analysis. . . .

(*Id.* at 9.)  VanRheenen then spent time in the hospital and, when he returned, he directed

his assistant to put the records into the Red Spot file.  (*Id.*)  Cueller stated that the

"documents fell into a black hole and [BME was] not aware of the fact that [it] had the[]

documents other than in the limited capacity of the very limited review."  (*Id.*)

14

Cueller represented that if BME had known about these documents there would have been more time entries investigating what the documents were about.  (*Id.* at 10.) BME represented that the failure to turn the documents over in discovery was an oversight and not intentional.  (*Id.*)  Cueller summarized:

> [W]e still can't say for certain whether we have an obligation to supplement certain discovery requests because we are just now investigating the substance of these documents.
>
> I will tell you, sir, just our initial review of these documents and our conversations with our expert, these documents do not change the dynamics of the case.  These two analyses do not add, nor do they diminish from the facts of this case.  These documents are very uncertain.
>
> As I said, Your Honor, we are not even sure that they were prepared by Red Spot.  We are still investigating that.  But we have other investigation we want to conduct with respect to [the hazardous waste management disposal company] to see what we can find out from those folks as to what was their practice; how did they run the GCs [gas chromatographs]?

*Id.* at 10-11.

1100 West represented that BME had "sanitized" the EPA RCRA file by pulling out the most damaging documents.  (*Id.* at 12-14.)  1100 presented specific documents along with an explanation for their relevance or the reason they were responsive to discovery requests.  (*Id.* at 14-31.)  1100 West pointed out to the Court that several documents contradicted Henry's Rule 30(b)(6) testimony regarding chemical spills on the property.  (*Id.* at 27-29.)

After a short recess, the Court marked exhibits presented to it by Red Spot.  (*Id.* at 32-33.)

BME represented that it made no selective removal of documents.  (*Id.* at 38.)

1100 West informed the Court that BME's associate, Klein, who had reviewed the EPA RCRA file when it arrived at BME, had been an assistant commissioner for compliance and enforcement at IDEM who specialized in RCRA cases.  (*Id.* at 42-43.) 1100 West suggested that with his experience, Klein knew exactly what he was looking for when he reviewed the EPA RCRA file.  (*Id.* at 43.)  1100 West pointed out that for some reason Klein had not pulled out the waste manifests to show VanRheenen; but they were in the stack of documents misplaced by VanRheenen on October 15, 2008.  (*Id.* at 43.)

The Court set a briefing schedule for 1100 West's Motion for Sanctions.  (*Id.* at 46-48.)

On October 27, 2008, 1100 West filed the instant motion.  (Docket No. 448.)  Based on the number of depositions that 1100 West requested as a result of the newly-discovered EPA RCRA documents, in addition to the fact that several attorneys were on the list of witnesses, the Court re-set the discovery schedule and a briefing schedule, including allowing 1100 West to file a supplemental brief after sanctions discovery had been completed.  (Docket No. 465.)  The Court also advised Red Spot to obtain separate counsel for purposes of responding to 1100 West's Motion for Sanctions because it appeared to the Court that allegations in the motion set its interests at odds with those of BME.  (*Id.*)

On January 9, 2009, 1100 West filed a Motion to Compel in which it argued that Red Spot had waived the attorney-client and work-product privileges with respect to the EPA RCRA file and with respect to newly-discovered responsive documents located by 1100 West at Red Spot.  (Docket No. 495.)  1100 West indicated that following a Rule 34 Request for Inspection of Documents, it learned for the first time that Henry's statement

16

during her Rule 30(b)(6) deposition, that she had reviewed twenty to twenty-five boxes of documents to prepare for her deposition, was misleading because there were in fact sixty-eight boxes and two filing cabinets of documents in the relevant storage area. (*Id.* at 2.) Contained within those newly-discovered responsive documents were more references to TCE as a substance that might have been used on Red Spot's property. (*Id.* at 2-3.)

After a full briefing of the issues presented by 1100 West's Motion to Compel, on January 30, 2009, the Court found that 1100 West had presented *prima facie* evidence that Red Spot had committed discovery fraud and had made misrepresentations to the Court in pleadings with respect to the newly-discovered documents that amounted to a fraud on the Court. (Docket No. 502, at 1-12.) As a result, the Court concluded that Red Spot had waived the attorney-client and work-product privileges with respect to both the EPA RCRA documents and the newly-discovered responsive documents. (*Id.* at 12-14.)

As previously set forth, on May 6 and 7, 2009, the Court held a hearing on 1100 West's Motion for Sanctions at which 1100 West presented no witnesses, choosing to stand on the facts as set forth in the documents and briefs. Red Spot presented several witnesses. All parties and interested parties had an opportunity to question said witnesses and to provide closing statements in support of their arguments.

## B. NEWLY-DISCOVERED RELEVANT EVIDENCE

The discovery that occurred following the filing of this motion on October 27, 2008, and the date of the hearing in this matter, May 6 and 7, 2009, indicated that Red Spot: 1) most likely used PCE and/or TCE as a vapor degreaser/parts washer outside of the laboratory in Building 3; 2) most likely used TCE as a solvent in some of its products; and

3) used PCE as a constituent of a raw material called "Super Ad-It" that was used to manufacture architectural paints.  None of these uses was disclosed to 1100 West pursuant to discovery requests and none of this information was disclosed to the Court in pleadings or during hearings, save the hearing on the sanctions motion.

Specifically, either the EPA RCRA discovery or subsequent discovery uncovered the following, in approximate chronological order:

- Red Spot's 1986 Material Safety Data Sheet ("MSDS") for its Satin-Flo Latex Semi-Gloss Antique White paint lists PCE as an ingredient (Pl.'s Ex. 51, at Red Spot 070001).

- Red Spot's 1987 MSDS for its Satinall Flat Latex Wall Paint Morning Cloud lists PCE as an ingredient (*Id.* at 010554).

- An April 3, 1987, sample analysis report indicates that TCE was present in Red Spot's dirty wash-up solvent.  (Pl.'s Ex. 3, at D2-0213.)

- A June 12, 1987, sample analysis report indicates that TCE was present in Red Spot's dirty wash-up solvent.  (*Id.* at D2-0192.)

- A September 28, 1987, letter from Red Spot's Material Control Manager, Eugene Berkey ("Berkey"), to the EPA details the quantity of spent solvents generated from November 1, 1986, through August 31, 1987, and identifies the amount of waste per chemical.  (*Id.* at D2-0081 to 0087.)

- Red Spot's letter dated July 12, 1990, from then manager of environmental engineering de Heus, to Whirlpool, identifies PCE in trace concentrations in Red Spot's formula SV3053 (Pl.'s Ex. 51, at 41230).

- An April 22, 1991, OxyChem MSDS delivered to Red Spot for TCE vapor degreasing grade (*Id.* at 031175).

- An internal memo dated May 18, 1992, to Red Spot's research and development personnel from Red Spot's then environmental manager, Troy Oliver ("Oliver"), lists TCE as one of the chemicals still used to some degree in Red Spot's operations (*Id.* at Red Spot 050217).

- A 1992 "Waste Profile" prepared by Systech Environmental Corp. delivered to Red Spot, including analytical results of Red Spot's "wash solvent paint production," shows PCE as a component of Red Spot's wash solvent (*Id.* at 003382-83).

18

- Red Spot's "Raw Master List for Non Formula as of 06/13/93" listing PCE as Item No. 70063, which was assigned because Red Spot used PCE in its business (*Id.* at 070011; Pl.'s Ex. 58, Webley Feb. 23, 2009, Dep. at 115-16).

- A January 24, 1994, MSDS delivered to Red Spot by Misco International Chem for "Super Safety Solvent" lists TCE as a 95% constituent by weight (Pl.'s Ex. 59, at RSBMERV 009946).

- Red Spot's "70000 Series Master List as of 04/10/96" lists PCE as Item No. 70063, which was assigned because Red Spot had PCE in a raw material (Pl.'s Ex. 59, at RSBMERV 006118; Pl.'s Ex. 58, Webley Feb. 23, 2009, Dep. at 115-16).

- A 1997 "Waste Profile" prepared by Systech Environmental Corp. delivered to Red Spot, including a "Material Analysis" of Red Spot's "wash solvent," shows PCE as a component (Pl.'s Ex. 51, at Red Spot 024827-29).

- Red Spot's "Contains Code List As Of 5/28/97," attached to Henry's June 2, 1997, fax to Art Sensmeier ("Sensmeier"), lists raw materials in Red Spot products including PCE as raw material code C3 (*Id.* at 049290-92).

- Red Spot's 1998 "HAPS List" from its Dbase Rawmast – HAPS Comparison" lists PCE as a component of Red Spot's Hazardous Air Pollutants (*Id.* at 008801-49; *id.* at 008838).

- Red Spot's undated "Toxic Organic Compound Inventory," lists PCE as one of its "Toxic organic compounds used" (*Id.* at 077595).

- Red Spot's "Hazardous Substances" file, including a listing of "Hazardous Substances Contained in Mixtures," includes PCE as Raw Material 16038 (*Id.* at 034349-50; *id.* at 034344-53).

- Henry's May 22, 2007, email to VanRheenen, in which Henry indicated that information contained in Red Spot's Provision database shows "PCE is within Super Ad It [sic] at 10%" (Pl.'s Ex. 49, at RS110028368).

In total, 1100 West discovered 70,000 responsive documents contained in the sixty-eight boxes and two filing cabinets in the basement of Building 3 on Red Spot's property. Since that production in December 2008, Red Spot has produced thousands of other responsive documents in February 2009 and April 2009.

19

### C.  THE TIME LINE OF RED SPOT'S KNOWLEDGE ABOUT TCE & PCE USAGE & THE TIME LINE OF ITS DISCLOSURES

The history of Red Spot's environmental issues date back, at least, to the 1990s.

In September 1994, after an EPA/IDEM inspection, then environmental manager, Oliver,

wrote the following personal observation:

> Basically, I believe that as bad as the situation and forthcoming legal battle
> may be, we are very very lucky that it wasn't worse.  Throughout the
> inspection, I kept my own scorecard. I counted virtually five instances to the
> IDEM inspector's one.  The inspectors got very tired and sloppy as time went
> on and they were very easily disoriented when I began the game of spin
> around and find your way around our twenty-five acre facility.  On our tour,
> we totally missed the upstairs production area and process labs, half of the
> downstairs lab areas, the old color lab and research lab areas, the outdoor
> pre-batch enclave, the upstairs lacquer plant, the test lab, the A&D dock,
> maintenance, central store, etc.  Overall we diverted the inspectors away
> from half of our facility and potentially twice as many violations.  Had the
> inspectors had more time, been better educated, and had a keener sense of
> direction, we would have suffered greatly.  Most of our deficiencies can be
> patched as before, but this time, I really think it is time to start fixing these
> deficencies [sic].

(Pl.'s Ex. 59, at RS110000698.)

Evidence indicates that Henry knew perhaps as early as 1994, but at least by 1997,

that Red Spot used a product that contained PCE on its property.  Purchase records

produced by Red Spot to 1100 West on April 14, 2009, indicate two entries for February

3, 1994, in Red Spot's purchase records that confirm that Red Spot used products that

contained PCE.  (Pl.'s Ex. 92, at RS-ICE 121533, 121583.)  Henry's initials appear next to

those two entries.  (*Id.*)

Then, on June 13, 1997, Henry sent a fax to Red Spot's senior chemist, Sensmeier,

asking his department to enter the "Contains" information on Red Spot's raw material

computer database.  (Pl.'s Ex. 50, at Red Spot 049290-92.)  Sensmeier testified that the

"Contains Code" was used to track raw materials contained within Red Spot's products.

(Sensmeier Mar. 3, 2009, Dep. at 44.)  Attached to Henry's June 13, 1997, fax was a raw material code "C3" for PCE.  (Pl.'s Ex. 51, at Red Spot 049290.)

In any event, clearly by late 2005 Henry was aware that Red Spot may have used TCE and that one of its raw materials had contained PCE.  On or about November 23, 2005, Henry told VanRheenen that TCE may have been a component of a Red Spot solvent.  (Red Spot Ex. 20, at BME06824-27.)  Further, in an email dated December 8, 2005, with a subject, "Chlorinated solvents," Henry told VanRheenen that PCE was historically used at Red Spot.  (Pl.'s Ex. 49, at RS110008577-78.)  As indicated by the 1994 and 1997 entries regarding PCE, Henry went on to inform VanRheenen that the materials listed, including PCE, were not purchased as 100% product, but were contained within Red Spot's raw materials.  (*Id.* at RS 110008578.)  In response, VanRheenen requested more detailed information about products like PCE including the years the products were used, the amounts of those raw materials used on an annual basis, what products they were used in, and how much of Red Spot's volume of business those products comprise.  (BME Sanction Hr'g Ex. DD.)  Henry testified at the sanctions hearing that she never provided answers to those questions.  (Sanctions Tr. at 243.)  Apparently, however, she did make one inquiry of Red Spot's information systems people regarding the quantity of Super Ad-It used in response to VanRheenen's questions, but without success.  (*Id.* at 244-45.)  Henry reported back to VanRheenen that she could not find the information.  (*Id.* at 245-46.)

On February 8, 2006, Henry testified in a deposition as Red Spot's Rule 30(b)(6) representative that she had talked to Mike Webley ("Webley") about the report of TCE in the UST pit as reported to IDEM and he was not aware of any TCE in Red Spot's wash

21

solvent, nor was Webley aware that any TCE was stored on Red Spot's property.  (Henry, Rule 30(b)(6), Feb. 8, 2006, Dep. at 225, 235, 308.)  She also testified that she was not aware of Red Spot's use of TCE on the property, but Webley or Sensmeier might have such knowledge.  (*Id.* at 308.)

On April 10, 2006, VanRheenen informed Cueller and Lucas that Red Spot had two solvent USTs that "probably included TCE from time to time."  (Pl.'s Ex. 48, at BME01183.) According to VanRheenen, he surmised this from the test results from soil samples collected in the area of the USTs that had been excavated in 1989.  (VanRheenen Dep. at 69-70.)  In internal emails dated on or around April 13, 2006, regarding Red Spot's response to 1100 West's Interrogatory No. 4, that asked whether Red Spot used or stored TCE at any time, VanRheenen noted that there was some analytical data that Henry found that appeared to show that "TCE was a minor constituent in some solvent blend on at least one occasion."  (Pl.'s Ex. 49, at RS110008623.)  However, on April 18, 2006, Red Spot responded, "No," to 1100 West's Interrogatory No. 4.  Similarly, on June 5, 2006, Red Spot indicates to 1100 West that it had no documents regarding the use of either TCE or PCE on its property.  (Pl.'s Ex. 30.)

Later in June 2006, Henry learned more about PCE and TCE used at Red Spot. On June 16, 2006, Henry interviewed Sensmeier.  (Pl.'s Ex. 48, at BME00552.)  Henry reported that Sensmeier told her that "one drum of TCE was kept next to the parts washer at any time" in the laboratory in the 1960s and 1970s.  (*Id.*; Sanctions Tr. at 74.)  On the same date, Henry interviewed Mark Lutterbach ("Lutterbach").  Lutterbach told Henry that Red Spot used TCE in its vapor degreaser, the same piece of equipment Sensmeier had discussed, in the same time frame.  (Pl.'s Ex. 48, at BME00552.)

In an email dated June 16, 2006, Henry informed Cueller of the information provided to her by Sensmeier and Lutterbach. (*Id.* at BME00551-52.) Cueller, in turn, forwarded Henry's email to VanRheenen and Lucas. (*Id.* at BME00551.) Lucas questioned VanRheenen, "What is this?" (*Id.*) VanRheenen then inquired of Cueller, "[D]o we need to adjust any discovery responses based on this?" (*Id.*) Cueller responded that the time period of use indicated by Sensmeier and Lutterbach fell outside the "period in dispute, as established by [1100 West]." (VanRheenen Ex. 6, at BME01263.)

In its response to 1100 West's requests for admissions, on June 16, 2006, Red Spot denied that it stored, used, or handled TCE on the property during the "Relevant Period." (Pl.'s Ex. 15, Req. for Admis. #8.) On July 17, 2006, VanRheenen asked Cueller whether Red Spot's discovery responses needed adjusted in light of the Sensmeier/Lutterbach information. (Pl.'s Ex. 48, at BME00551-51.)

On March 15, 2007, Sensmeier testified that he did not recall any historical use of TCE by Red Spot. (Sensmeier Mar. 15, 2007, Dep. at 9.) Specifically, Sensmeier testified:

Q      Are you aware of any historical use of TCE by Red Spot?

A      I don't recall using that material.

(*Id.*)

On or about May 22, 2007, Henry searched Red Spot's Provision database for PCE. (Pl.'s Ex. 51, at Red Spot 049290.) Henry's search revealed that a raw material used by Red Spot called "Super Ad-It" contained PCE at a concentration of 10%. (*Id.*) Henry informed Cueller and VanRheenen of her discovery. (*Id.*) Cueller responded to Henry that they would discuss it later that day. (*Id.* at RS110028367.)

23

On May 23, 2007, during a deposition, Henry testified that Red Spot had not used TCE in connection with its part washers since she had started with the company in 1993. (Pl.'s Ex. 71, Henry, May 23, 2007, Dep. at 72.)  Prior to that, Henry had discussed the matter with Webley, who told her that he could not remember using TCE in the parts washers either, and his experience at Red Spot dated back to the 1970s.  (*Id.*)

On May 24, 2007, Storms, who at the time of his deposition was President and Chairman of the Board of Red Spot, testified that it would have been "very unlikely" that Red Spot used TCE at its Evansville site because, in part, the company makes paint for plastics there and plastics cannot withstand TCE.  (Storms, May 24, 2007, Dep. at 63-64; Sanctions Tr. at 13)  Storms also testified that he recalled using methylene chloride at the site some time after 1941 in paint strippers, but likely ceased using the product in 1991 when it sold that part of the business.  (Pl.s' Ex. 66, Storms, May 24, 2007, Dep. at 47-48.)

On May 25, 2007, through some time in June 2007, Henry and Cueller interviewed several Red Spot employees about the use of TCE and PCE at the property.  (Pl.'s Ex. 48, at BME00141-42.)  Specifically, on May 25, 2007, Henry and Cueller interviewed Morgan Jones ("Jones"), who told Henry and Cueller that PCE was used in connection with a "small lab degreaser."  (*Id.* at BME00142.)  Apparently in a later conversation, Jones told Henry and/or Cueller that it was TCE or PCE that was used in the degreaser until at least 1985 when he left the lab area.  (*Id.*)

On May 25, 2007, Henry and Cueller also talked with Wayne Riley ("Riley") who recalled using PCE as a degreaser where the container held between ten and fifteen gallons of PCE.  (Pl.'s Ex. 95, at BME00543.)  Similarly, Jim Jansen ("Jansen") told Henry

on or about May 29, 2007, that he recalled PCE being used in the vapor degreaser in the time period between 1968 and 1980.[1]  (Pl.'s Ex. 48, at BME00144.)

In her September 3, 2008, Rule 30(b)(6) deposition, Henry testified that to prepare for her deposition she had talked with "historic people at Red Spot," including Joe Ward ("Ward"), Oliver, Gary Thomas, deHeus, Bob Reisz, Greg Schwartz, Jim Elam, Larry Eirwin, and Jeff Meyer.  (Henry, Rule 30(b)(6), Sept. 3, 2008, Dep. at 7.)  She also testified about additional documents that she had located in her archived files that had recently been produced related to sampling.  (*Id.* at 175-76.)  Apparently, the sampling related to the removal of the USTs where data had shown the presence of TCE.  (*Id.* at 237.)

Henry also stated that she had looked through all of the MSDS sheets in her possession and had produced the two that referred TCE as a constituent.  (*Id.* at 206-08.)  Apparently, one was used as a brake cleaner by Red Spot's maintenance personnel.  (*Id.* at 207-08.)

On cross-examination by Cueller, Henry stated:  "I've talked to historical people who said that TCE was never contained in any of our formulations.  It was not a product we used, and it was not within our wash-up."  (*Id.* at 227-28.)  In forming this statement, Henry spoke with Sensmeier, Jansen, deHeus, Greg Schwartz, Webley and Joe Ward ("Ward").  (*Id.* at 228.)

On December 29, 2008, Red Spot produced to 1100 West the totality of the sixty-eight boxes and two filing cabinets of documents from the basement of Building 3.  On

---

[1]The Court notes that Sensmeier, Lutterbach, Jones, Riley, and Jansen were all talking about the same parts washer/vapor degreaser outside the laboratory.

February 14, 2009, Red Spot produced to 1100 West additional responsive documents that had never before been produced.

On March 2, 2009, Storms testified that Red Spot had used TCE, vapor degreasing grade, perhaps until 1991. (Storms, Mar. 2, 2009, Dep. at 61-62.) Storms explained that when he was asked about TCE in his prior deposition, he thought the question was directed to the raw materials for Red Spot's paint formulations. (*Id.* at 64.) Similarly, Storms stated that when asked about PCE, that it was not "a direct chemical" that Red Spot used; rather it might have been an impurity in certain additives. (*Id.* at 64.) Storms knew that PCE was an "impurity" in Super Ad-It; he testified that it was there in a very small percentage, less than 2%. (*Id.* at 64-65.)

On March 3, 2009, Sensmeier testified that Red Spot used TCE in a vapor degreaser where the research center used to be located in the 1970s. (Sensmeier, Mar. 3, 2009, Dep. at 14-15.) Therefore, Sensmeier agreed that Red Spot had used and stored TCE on its property in connection with the vapor degreaser. (*Id.* at 27.) Sensmeier agreed with everything written in Henry's communication to Cueller dated June 16, 2006, except that the reference to changing to "trichloroethylene," when TCE was banned, should have been a reference to "trichoroethane" ("TCA"). (*Id.* at 16-17.)

On March 3, 2009, Lutterbach testified that, although Red Spot did not use TCE as a raw material, it did use it in a degreasing application. (Lutterbach, Mar. 3, 2009, Dep. at 86-87.)

On March 6, 2009, Thomas Brown ("Brown"), a former Red Spot Manufacturing Manager,[2] recalled during his deposition that Red Spot purchased TCE in "drum quantities." (Brown, Mar. 6, 2009, Dep. at 65-66.) Brown testified that it would not have surprised him to learn that TCE was a minor constituent of some solvent blend that Red Spot used in its operations. (*Id.* at 50-51.) Similarly, Brown stated that he would not be surprised to learn that PCE and TCE showed up in Red Spot's dirty wash solvent or in its products. (*Id.* at 47-48; 65.) But, Brown also testified that TCE was something that Red Spot actually used because it is a fantastic solvent and Red Spot was a lacquer-based company. (*Id.* at 52-53.)

On March 27, 2009, Henry testified as Red Spot's Rule 30(b)(6) witness regarding the sum and substance of the newly-discovered responsive documents produced by Red Spot to 1100 West between October 2008, and the date of the deposition, that referred to TCE and/or PCE. (Henry, Rule 30(b)(6), Mar. 27, 2009.) Henry testified that she had interviewed the following employees, among others, to prepare for the deposition: Webley, Sensmeier, Lutterbach, Storms, Riley, Jones, and deHeus. (*Id.* at 6, 8.)

Henry testified that Webley told her that Red Spot used Super Ad-It in small amounts. (*Id.* at 9-12.) There were less than twelve, 55-gallon drums on site at any given time. (*Id.* at 106-07.)

Henry stated that in her conversation with Sensmeier the previous Thursday, he stated that "he knows he used 1,1,1 trichloroethane, which is TCA, when he used the vapor degreaser. He thinks it was possible, but he said it was speculation, that TCE was used

---

[2]Apparently, after discovery of the EPA RCRA file, Henry discovered that Thomas Brown might have relevant information regarding the use of TCE or PCE on Red Spot's property. (Sanctions Tr. at 221-23.) A BME lawyer interviewed Brown. (*Id.*)

27

in the vapor degreaser before TCA." (*Id.* at 20.)  Similarly, Henry testified that in her conversation with Lutterbach, "he said that [his prior recollection of TCE being used] was speculation on his part.  He wasn't sure if it was TCE or not.  He did not use [the vapor degreaser] that much at all, so that's where his idea came from." (*Id.* at 24.  *See also id.* at 25-26 (repeating the same statement, and clarifying that Lutterbach was not sure now what material was used in the degreaser).)

With respect to her conversation with Storms, Henry testified:

Q    What did Mr. Storms tell you about Red Spot's use or storage of TCE?

A    Unless it's otherwise stated in Exhibit 3, my recollection is that he didn't recall Red Spot actually using it.

* * *

Q    Is it your understanding having read [Mr. Storms' March 2009] deposition transcript that Mr. Storms testified with no equivocation that Red Spot had used TCE in the past?

* * *

A    I don't remember reading it that he was absolutely sure.

(*Id.* at 28-29.)

Apparently, in her conversation with Riley, Henry stated that she became confused because earlier Riley had said that PCE was used, and in her conversation with Riley just before her March 27, 2009, deposition, Riley stated that he thought it was TCE that was used, not PCE.  (*Id.* at 41.)  When asked whether with Riley's statement to Henry just prior to her March 27, 2009, deposition Red Spot could now admit that it used TCE at its Columbia Street property in Evansville, Indiana, Henry replied:

A    We're still not certain which component, if either, was used in there because no one seems to be absolutely positive about the solvent that was used in there, except for Art Sensmeier saying he knows that he personally used TCA in the vapor degreaser.

28

* * *

Q    Ms. Henry, let me just go back and ask again, you interviewed a former employee named Mr. Riley last week, correct?

A    Yes.

Q    And Mr. Riley told you last week that he remembered that he used TCE at the Red Spot property; is that right?

A    Let me look back at the notes again, or look at the testimony again that I stated earlier.  I believe that I stated that in my prior notes he couldn't remember the use of TCE, but when I talked with him last week, he thought it was TCE that was used in the vapor degreaser.

Q    Okay.  So isn't it true that last week Mr. Riley, a former Red Spot employee, told you that he remembers using TCE at the Red Spot plant?

A    That was his memory as of last week.

Q    Okay.  So in light of Mr. Riley's statements to you last week to assist you in preparing for today's 30(b)(6) deposition, does Red Spot now admit that it in fact did use TCE at its facility at some point in time?

* * *

A    No, we wouldn't say that because of Mr. Riley's statement.

Q    And why not?

A    Mr. Riley can't tell us for certain.  He stated PCE at one time, he stated TCE at another time.  I have other employees who aren't absolutely sure, so I could tell you that they think that, that they're speculating that, but they aren't absolutely certain.

Q    Ms. Henry, I thought that Mr. Riley last week told you that he was certain that TCE had been used at Red Spot.  Isn't that what he told you last week?

A    That's what he said last week, but prior to that he said something else, so I can't be certain of exactly which one he's most certain of.

(*Id.* at 79-82.)

With respect to her conversation with Jones, Henry testified that Jones said very little PCE was used in the degreaser; as a result, a drum would be there for a long time. (*Id.* at 47.)  But, Henry also testified:

Q    . . . [Y]ou have been interviewing people who remembered and they were sure that PCE was used with the vapor degreaser, for example, Mr. Jones, correct?

A    Yes, but Mr. Jones has also said in the past he really would rely more on Art Sensmeier's testimony, and Art Sensmeier says that he thinks, he speculates that it was TCE.  So I don't feel comfortable saying that absolutely without a doubt anyone can say which solvent, if either, was used.

Q    And that's your summary after interviewing all of the people you've identified, correct?

A    Yes.

Q    When you say were used, you mean were used in connection with the vapor degreaser or used in any way?

A    Used in any way except for within the Super-Ad-It [sic].

(*Id.* at 48-49.)

Henry also testified that she had spoken with deHeus who regretted his deposition testimony in which he had indicated that he had not spoken with Henry.  (*Id.* at 59.)  When Henry spoke with him just prior to her March 27, 2009, deposition, de Heus stated "that he was wrong.  That he does remember Susan Henry being on the phone conversation that he had with Amy Cueller."  (*Id.* at 60.)

Henry also testified that she, personally, believed that documents with Bates Nos. Red Spot 077595 and 596 did not originate from Red Spot because the information contained therein did not relate to a Red Spot process.  (*Id.* at 83-84.)

With respect to Oliver's May 18, 1992, memo that underlined TCE, Henry testified on March 27, 2009, that it was Red Spot's position that "Oliver made a mistake in underlining trichloroethylene.  That he should have underlined methylene chloride.  That it was a mistake in using the system he was using."  (*Id.* at 99.)  She obtained this information from one of her attorneys, although she cannot recall which one, who had spoken with Oliver's attorney about the subject.  (*Id.* at 99-100.)  Henry testified that Sensmeier and Lutterbach both agreed that it would make more sense for methylene chloride to be underlined on the May 18, 1992, memo than TCE.  (*Id.* at 102.)

Similarly, with respect to Jan Nelson's, a BME lawyer, handwritten notes regarding Brown's recollections that TCE was used at Red Spot (BME00206), Henry testified:

Q      And on the second page of these notes, page BME207, there is the reference, the words TCE was used, it looks like it says, sure it was used, and then beneath that it says good solvent, and beneath that there is a question saying, "Can't imagine it ever not showing up."  Do you see that?

A      Yes.

Q      So what is Red Spot's position as to this document?

A      I talked to Mr. Storms about it and he simply said that he didn't believe that Mr. Brown's testimony was correct.

Q      Did he say anything else?

A      Mr. Storms didn't, and I did read Mr. Brown's deposition.

Q      Yes.

A      I think there was maybe some misunderstanding about the sentence in quotes.  I thought that what his deposition stated was that he couldn't imagine it ever showing up because of small amounts that were used.

Q      Did you read Mr. Brown's entire deposition transcript?

31

A       No.

Q       Did you read the part of Mr. Brown's transcript where he recalled that, or he testified that Red Spot bought TCE in drum quantities?

A       I don't recall if that was part of the deposition or not.  I don't think it was that I saw.

Q       It wasn't part of the deposition that you read?

A       Right.

Q       So Mr. Storms told you that he believed Mr. Brown was incorrect?

A       Right, he stated that Mr. Brown only worked at Red Spot for 18 months in production, and that his statement about being sure TCE was used was not totally consistent with other employees' knowledge.

Q       Did Mr. Storms try to contact Mr. Brown; do you know?

A       No.

Q       And you didn't try to contact Mr. Brown, correct?

A       That's right.  We did not.

Q       Did you suggest to your counsel that you should talk to Mr. Brown?

A       No.

Q       But I believe your testimony earlier today was that it was your counsel's suggestion not to talk to Mr. Brown; is that right?

                                    * * *

A       I don't think I said that they said that I was not to talk to him.  We just felt there were other people that would have more and better, reliable information than Mr. Brown would because of their tenure and where they worked.

(Henry, Rule 30(b)(6), Mar. 27, 2009, Dep. at 162-64.)

On April 14, 2009, Red Spot produced to 1100 West purchasing records, over 7,600 pages, for the first time.  (1100 West Reply, at 3.)  Several of those records evidence Red Spot's use of TCE and PCE.

## D.  HEARING TESTIMONY

### 1.  <u>Storms</u>

At the May 6 to 7, 2009, hearing, Storms testified that he started working full-time at Red Spot in 1966; he became President of the company in 1973, became CEO in 1989 and became Chairman of the Board in 1991.  (Sanctions Tr. at 8.)  He served in that capacity until Red Spot was sold on May 30, 2008, to Fujikura Kasei, a Japanese company.  (*Id.* at 8-9.)

At the time of the sale of Red Spot, Storms owned approximately 50% of the company's stock; Storms Limited Partnership, which is comprised of members of Storms' direct family, owned about 17% of the company's stock; other more distant relatives, together, owned about 20% of the company's stock.  (*Id.* at 25.)  Of the $63.2 million sales price, about $26 million had been placed in three escrow accounts.  (*Id.* at 25-26.)  One of the escrow accounts is referenced as the 1100 West litigation escrow account.  (*Id.* at 26.)  That account started out at approximately $14.6 million; it now contains roughly $14 million.  (*Id.* at 27.)  Pursuant to the 1100 West litigation escrow agreement, Storms is the shareholder agent.  (*Id.*)  Storms explained:

> A      That means I represent the shareholders, and I am controlling the strategic decisions as it relates to this lawsuit and other matters as might affect the shareholders . . . ."

Q      So with respect to this litigation, the 1100 West litigation, what brings us here today, despite the fact that Red Spot has been sold to Fujikura, you still, in fact, control the litigation; is that correct?

A      Yes.

Q      You pick the lawyers, correct?

A      Excuse me?  Yes.

Q      Pick the lawyers?

       And you assist in the strategic decisions; is that right?

A      With their counsel.

Q      Right.  And the reason for that is because there isn't anybody else in the world who has more of an interest in that 14.5 million, 6 million escrow than you, correct?

A      I am also the most qualified person.

(*Id.* at 27-28.)  Later, Storms agreed that it was up to him to "call the shots" in this litigation.

(*Id.* at 38.)

       Storms testified that in his May 24, 2007, deposition, when he answered questions about the use of TCE at Red Spot in the negative, he answered truthfully because he considered "use" to mean "that it appears in a formula as an item number or as described, an amount for that."  (*Id.* at 12.)  He stated that TCE is not suited for use in paint for plastics because it is very fast-evaporating and would be difficult to apply in a cosmetically pleasing way to plastics.  (*Id.* at 13.)

       Storms also testified that either PCE or TCE could have been used in the vapor degreaser at Red Spot, but he knew it was a chlorinated solvent.  (*Id.* at 14, 30.)  Storms commented that it was in a laboratory environment for product development and troubleshooting purposes.  (*Id.* at 30.)  Storms stated that he discussed with Henry, before

34

her March 27, 2009, Rule 30(b)(6) deposition, that it would have been unlikely for Red Spot to use TCE and PCE in its formulations for the various reasons he had already described. (*Id.* at 34.)  But, he claimed that at that time he discussed with Henry the use of chlorinated solvents of some sort in the vapor degreaser in a laboratory environment.  (*Id.*)

Storms testified that Red Spot used Super Ad-It as an additive for latex paints to reduce mildew or as a fungicide; in addition, it can stabilize the paint.  (*Id.*)  Storms stated that Red Spot used Super Ad-It in two lines of latex paint in its architectural products category of products. (*Id.* at 14-15.)  Storms claimed that prior to preparation for his March 2, 2009, deposition, Storms was unaware that Super Ad-It contained PCE.  (*Id.* at 15.) Storms testified that, after some investigation, he determined that Red Spot manufactured this line of paints until May 1989; they sold that line in June 1991.  (*Id.* at 15-17.) Therefore, for at least twenty years Red Spot used Super Ad-It as an additive for its architectural paints.  (*Id.* at 22.)

Under cross-examination, Storms admitted that, while Red Spot never used TCE as a single ingredient in its formulations, as an additive it appeared in two formulas in low concentrations:  0.0088% in one and 0.0093% in another.  (*Id.* at 42-43.)  Storms also confirmed that he believed that Red Spot had no TCE in its hazardous waste.  (*Id.* at 43.)

Storms testified that on May 23, 2007, the day before his deposition in May 2007. he met with Henry and Cueller to prepare.  (*Id.* at 47.)  The meeting lasted three hours and fifteen minutes.  (*Id.*)  Storms agreed that during that meeting he told Henry and Cueller that chlorinated solvents such as TCE and PCE were not conducive to Red Spot's paint formulas.  (*Id.*)  Similarly, he agreed that he told Henry and Cueller during that meeting that Red Spot did not use TCE or PCE.  (*Id.* at 47-48.)

Storms testified that his May 2007 deposition statement, "We don't purchase chlorinated solvents," was truthful because

> A     It was testimony of the current time.  At that time, we did not purchase chlorinated solvents.
>
> Q     At what time?
>
> A     At the time of this deposition and before, a few years before.
>
> Q     Well, did you say in your May 2007 – I am only limiting my question to a few years ago.
>
> A     That was my point of reference.
>
> Q     As a matter of fact, when [1100 West's counsel] asked you whether Red Spot used PCE, he asked it in the past tense, didn't he, page 66, line 16 of your May 2007 deposition?
>
> > "QUESTION:  Do you know whether Red Spot used PCE?"
>
> A     I say we did not.
>
> Q     You changed the answer to the present tense, "we [sic] do not," correct?
>
> A     Yes.

(*Id.* at 50.)

Storms also stated that when he testified in May 2007, he was unaware that Super Ad-It contained chlorinated solvents.  (*Id.* at 50.)  But, he knew in May 2007 that Red Spot had purchased chlorinated solvents "[i]n history."  (*Id.* at 50-51.)  He claims that he did not know if the chlorinated solvents were TCE or PCE.  (*Id.* at 51.)  Storms also testified that he made an effort to determine whether TCE or PCE was used on the Red Spot property by talking with "[l]egacy employees and, and current employees to see what their recollection was."  (*Id.* at 55.) Moreover, he testified that despite purchasing records

produced by Red Spot to 1100 West in April 2009 that indicated Red Spot had purchased PCE, Storms could not concede that Red Spot, in fact, purchased PCE.  (*Id.* at 51.)

Storms testified that he did not think "all of this could have been avoided" if he had testified in May 2007 that Red Spot had used PCE as part of Super Ad-It for over 20 years and as late as 1989, "[b]ecause it is an additive.  It is used in such an infinitesimal amount in the formulation that it is unlikely that it created the plume that exists today."  (*Id.* at 52.) Storms would not speculate on whether the sanctions hearing could have been avoided if he had made such a disclosure.  (*Id.*)

## 2. **Sensmeier**

After joining Red Spot in 1968 as a chemist, Sensmeier managed the special lacquer coatings research group for Red Spot from 1970 to 1980.  (*Id.* at 73.)  Then, from 1980 to 2003, Sensmeier managed the product development research group.  (*Id.*)  He managed a new product development group from 2003 until his retirement in 2007.  (*Id.*)

Sensmeier testified that he recalled a conversation with Henry in June 2006 regarding Red Spot's parts washer.  (*Id.* at 74.)  He testified that Henry's handwritten notes about the conversation were accurate in that he told Henry that Red Spot used TCE in the washer in the 1960s and 1970s, particularly the earlier of those years.  (*Id.*)  Sensmeier testified that when he told Henry that TCE had been swapped out for TCA, he believed that to be true.  (*Id.* at 85.)  Sensmeier confirmed his March 2009 deposition testimony that TCE was probably used on the Red Spot property in the 1970s in the degreaser.  (*Id.* at 86-88.)  He knows Red Spot used something before TCA in the degreaser and he believes that it was TCE.  (*Id.* at 88, 89.)  Sensmeier explained that his testimony to the contrary in

his March 2007 deposition was based on his misunderstanding of the term "historical use." (*Id.* at 77-78.)  He understood the March 2007 question to be directed to Red Spot's products or formulations, not to other processes that were not related to Red Spot's products.  (*Id.* at 79-80.)

### 3. <u>Henry</u>

Henry joined Red Spot in 1993 as an environmental health and safety clerk working for Oliver.  (*Id.* at 100, 227-28.)  She became Red Spot's Corporate Health and Safety Manager in 2000.  (*Id.* at 100.)

Henry, along with Steve Halling ("Halling"), Red Spot's Chief Financial Officer, and Pete Ruthenburg ("Ruthenburg"), Red Spot's Executive Vice President, were responsible for selecting BME.  (*Id.* at 101.)  Initially, Red Spot hired BME's Lucas to give it a second opinion on whether it should enter IDEM's VRP.  (*Id.* at 102.)  When 1100 West filed the state court suit in 2003, Halling and Ruthenburg decided to use BME for litigation as well. (*Id.* at 103.)  Henry understood BME and VanRheenen to have substantial experience in environmental lawsuits.  (*Id.*)  Generally, Henry felt that she, Lucas, VanRheenen, and Cueller were a team.  (*Id.* at 103-04.)

Henry testified that no one from BME ever helped her search for responsive documents in 2003 to answer 1100 West's 2003 Discovery Requests. (*Id.* at 111.) Rather, Henry did all the looking herself.  (*Id.*)  Henry testified that her historical file space was not organized.  (*Id.* at 115.)  The only organization she did the first time she looked through the boxes was to mark the outsides with a Sharpie as to the general contents of that box.  (*Id.* at 116.)  Henry never did a page-by-page review of the documents in the basement of

Building 3.  (*Id.* at 116-17.)  If she found a folder that looked like it had responsive documents contained in it, she would pull it out to look at the documents more closely.  (*Id.* at 117.)  She would pull out documents that she thought were responsive and send the originals to BME.  (*Id.*)  BME never told Henry her method was inadequate; BME never offered to help her go through the documents at that time.  (*Id.* at 117, 121.)  After her first search in 2003, Henry narrowed the number of boxes she would return to for subsequent requests based on her initial sort and markings.  (*Id.* at 119.)

Henry testified that she did not recall TCE becoming part of the lawsuit until a June 2005 sampling report indicated TCE in high concentrations on 1100 West's property.  (*Id.* at 121-22.)  1100 West filed this lawsuit in November 2005.  (*Id.*)

In January 2006, Henry met with VanRheenen, Webley, and Sensmeier to prepare for Henry's first Rule 30(b)(6) deposition.  (*Id.* at 122-24; Def.'s Ex. RS-15.)  Henry testified that she would turn to Webley, who had been with the company since the 1970s and had been production manager for many of those years, for historical information and to Sensmeier for chemistry information.  (Sanctions Tr. at 125.)

VanRheenan's notes indicate that at the meeting, Sensmeier told him and Henry that a vapor degreaser used chlorinated solvents.  (*Id.* at 126.)  The degreaser held five to ten gallons of solvent with a drum sitting next to it.  (*Id.*)  Sensmeier had reported that Red Spot did not use too much of the solvent and that it was not used after the 1970s.  (*Id.*)  VanRheenen's notes indicate that Sensmeier recalled the solvent was "111 TCA." (Def.'s Hr'g Ex. RS-15.)  Sensmeier also told VanRheenen and Henry that dirty solvent would go to Red Spot's wash up system, but not in large quantity because most of the solvent would evaporate.  (Sanctions Tr. at 126.)

In addition, VanRheenen's notes from January 2006 state: "Historically perc was an ingredient in Super Ad-It." (Def.'s Hr'g Ex. RS-15; Sanctions Tr. at 198.) The notes also indicate that one of the meeting participants indicated that Super Ad-It was used in trade sales. (*Id.*) At the sanctions hearing, Henry testified that she did no investigation in response to finding out that Red Spot had used Super Ad-It that contained PCE because she was not directed to do so "and that is not something [she] would have just done on [her] own." (Sanctions Tr. at 198-99.)

As of April 13, 2006, when Red Spot answered 1100 West's discovery requests, Henry stated that she had no information about the use of TCE on Red Spot's property. (*Id.* at 127.) In addition, although Henry reviewed Red Spot's discovery responses, she relied on BME to decide what set of facts constituted "use or storage" as those terms had been used by 1100 West in Interrogatory No. 4. (*Id.* at 129-30.) Similarly, Henry relied on BME to decide the appropriate time frames for discovery requests. (*Id.* at 131.) Henry testified that either Cueller or VanRheenen had been with her when she obtained information regarding TCE. (*Id.*)

On May 31, 2006, Henry testified that she forwarded documents regarding remediation summaries to BME. (*Id.* at 132-33; Def.'s Hr'g Ex. RS-18.) Apparently, it had been Henry's habit to forward things to BME she thought were relevant, or whenever a thought occurred to her and she searched for more documents in the basement. (Sanctions Tr. at 132-33.) In her May 31, 2006, communication to Cueller, Henry referenced that she "may have more," but could not recall at the sanctions hearing to what that statement referred. (*Id.* at 134.) Cueller forwarded Henry's email to VanRheenen and

Lucas with the message, "Guys, this is a little bit scary." (*Id.* at 134-35; Def.'s Hr'g Ex. RS-19.) VanRheenen responded:

> I agree. I think I mentioned that when I asked her to bring originals of previously-produced documents for the 30(b)(6) depo, she couldn't find originals of all the ones previously produced and found additional documents not previously produced. I think someone needs to go hold her hand for a day for a comprehensive file search at RS. Amy, how about if you and I discuss whether that should be one of us, or a decently tuned in associate. What do you think?

(Def.'s Hr'g Ex. RS-19.) Cueller agreed to meet with Henry. (*Id.*)

Henry testified that Cueller contacted her and came down to Evansville on June 12, 2006. (Sanctions Tr. at 135-36.) Henry opened the door to the basement of Building 3 and told Cueller, "Here they are." (*Id.* at 136-37.) Henry did not stay with Cueller nor did she limit Cueller's review in any way. (*Id.* at 137.) Cueller did not offer Henry any suggestions on how to better organize the files in the basement of Building 3. (*Id.* at 138.) Henry testified that she did not realize that she should have been doing her search a different way or organizing the information in a different way until Red Spot's new attorneys looked through the boxes of documents in the basement. (*Id.* at 139-41.)

Henry testified that Cueller was present when, on June 15 or 16, 2006, Henry talked with Sensmeier about Red Spot's use of TCE in the vapor degreaser. (*Id.* at 199.)

At the sanctions hearing, Henry testified that she does not know why in her May 2007 Rule 30(b)(6) deposition she failed to disclose Sensmeier's recollection that TCE was used in a parts washer, the vapor degreaser, in the laboratory. (*Id.* at 201-02.) Moreover, she stated that her May 2007 testimony in that regard was truthful because the only time the vapor degreaser had been called a parts washer was in her conversation with Sensmeier and Red Spot did not use TCE in its other parts washers, Red Spot used MEK

in acetone in those.  (*Id.*)  In other words, "[m]aybe" 1100 West did not ask the right question.  (*Id.* at 202-03.)

Henry testified that when she said in her September 2008 deposition that she had reviewed twenty to twenty-five boxes, she had not counted all the boxes in the room because, after she first reviewed them in 2003, she did not review all the boxes in the room to respond to discovery requests or to prepare for depositions.  (*Id.* at 141-42.)

At the hearing, Henry explained her September 2008 deposition testimony that Ward had no knowledge of TCE usage.  (*Id.* at 169-70.)  Henry stated that at the time of the deposition she was thinking about whether Ward had knowledge about the use of TCE in the vapor degreaser, which he did not.  (*Id.* at 170-71.)  She did not mention the limited use she discussed with Ward because: "Well, I wasn't asked about it any further."  (*Id.* at 170.)

With respect to her denial that Red Spot used products that contained TCE in processes other than manufacturing in her September 2008 deposition, Henry testified at the hearing as follows:

> Q     Miss Henry, I asked you for Red Spot's corporate collective knowledge concerning the use of TCE and any process other than manufacturing.  You forgot to tell me that Joe Ward said that he had used it as a degreaser in an aerosol can, and you also forgot to tell me that other employees had told you that Red Spot had used TCE and PCE in a vapor degreaser; isn't that true?
>
> A     I did forget about Joe Ward.  I didn't get that one right within, from my memory.  However, several employees went back and forth on TCE or PCE and the vapor degreaser.  So, that is whey I did not say yes, it had been used.  I really wasn't sure, as it appears others were not sure what solvent was used within the vapor degreaser other than Art's recollection that TCA was for certain.
>
> Q     You didn't tell us that you had been told by employees that they recalled TCE had been used.  Isn't that a fair statement?

42

A      Yes.

(*Id.* at 182.)  Henry testified that when Sensmeier told her in June 2006 that he had used

TCE in the vapor degreaser, Henry never tried to find an MSDS for that TCE.  (*Id.* at 195.)

Henry stated that until October 2008, she was unaware that BME had received the

Red Spot EPA RCRA file.  (*Id.* at 172-73.)  Despite the fact that some of the EPA RCRA

file documents were also located in the sixty-eight boxes and two filing cabinets in the

basement of Building 3, Henry testified that she was unaware of the documents contained

in the file until October 2008.  (*Id.* at 173.)  Although she was aware that something had

occurred regarding the file because Cueller called her, Henry was unaware of the

representations BME made to the Court during the October 15 and 17, 2008, hearings.

(*Id.*)  Henry testified that she did not have responsibility for the EPA RCRA file documents

at Red Spot or for conversations between Red Spot and the EPA.  (*Id.* at 223.)  According

to Henry, Berkey, who Henry thought was a purchasing manager, had that responsibility.

(*Id.* at 254-55.)

In Red Spot's April 7, 2009, supplemental response to 1100 West's Interrogatory

No. 4, which asked about whether Red Spot used or stored the chemical TCE at Red Spot,

as a substance or a constituent of a substance, Henry agreed that Red Spot's new

response was:

> Red Spot states that certain of its current and former employees have
> recalled using trichloroethylene in a vapor degreaser on the Red Spot
> property.  These employees generally recalled use prior to 1980.  Red Spot
> also states that it possesses at least one document which seems to indicate
> that Red Spot has used trichloroethylene at the Red Spot property.

(*Id.* at 183-84.)  Henry testified that the single document referred to in this answer was

located in a small book that was kept by Red Spot's prior purchasing manager.  (*Id.* at

43

184.)  The document has the word "trichloroethylene" with a date next to it, 1979.  (*Id.* at 185.)  In addition, there was a product number assigned to the TCE.  (*Id.* at 186.)  In the same batch of purchasing records, there was evidence that Red Spot had purchased PCE, as well as Super Ad-It.  (*Id.* at 185-86.)  Henry testified that, based on these entries, it was more likely than not that Red Spot had purchased TCE and PCE at some time.  (*Id.* at 185-86, 207-08.)

On April 14, 2009, Red Spot produced to 1100 West approximately 1,300 pages of documents that Henry identified as purchasing records.  (*Id.* at 185.)  The handwritten small book was part of the that production.  (*Id.*)  Not all of the 1,300 purchasing records were from the small book.  (*Id.* at 187.)  Some were computer print outs that also indicate that PCE was used by Red Spot at a later time, probably as a component of Super Ad-It.  (*Id.* at 187-88.)

In her February 7, 2006, deposition Henry had stated that she was the most knowledgeable person at Red Spot concerning the chemical constituents Red Spot bought.  (Henry, Rule 30(b)(6), Feb. 7, 2009, Dep. at 163.)  When 1100 West inquired about where all the purchasing records for Red Spot could be located, Henry referred 1100 West to a print out Henry had provided and that was referred to as AS400.  (*Id.* at 309.  *See also id.* at 283-84.)  Henry testified then that she did not know if there were any hard copy purchasing records available for the time period prior to the date from the AS400 system.  (*Id.* at 309.)

On this same topic at the sanctions hearing, Henry testified that with respect to what was in Red Spots formulations, Henry was the expert because she worked with FoxPro and Provision, two databases that hold Red Spot's raw materials that are used in

44

formulations.  (Sanctions Tr. at 192-93.)  Henry stated that AS400 contained purchasing records and FoxPro and Provision contained chemical constituent information; therefore, the later two were not purchasing records.  (*Id.* at 192-93.)  Apparently, Henry was never told about the availability of other hard-copy purchasing records until after her March 27, 2009, deposition.  (*Id.* at 193-94.)

Brown was identified as a potential witness by Red Spot and BME after October 2008, when the EPA RCRA documents came to light.  (*Id.* at 221-22.)  According to Henry, someone from BME interviewed Brown after Henry provided BME Brown's contact information on November 4, 2008.  (*Id.* at 223.)  Before her March 27, 2009, Rule 30(b)(6) deposition, Henry did not make an effort to contact Brown personally.  (*Id.* at 217-19.)  At the sanctions hearing, Henry explained:

> Q       . . . Did your attorneys [(Ice Miller and Foley & Lardner)] instruct you not to contact Mr. Brown?
>
> A       They didn't say not to contact him.  They just said – he was not one of the people we were going to contact.  That is what they said.
>
> Q       Did you understand that you would be under oath to testify about the aggregate knowledge under Federal Rule 30(b)(6) of Red Spot Corporation at your March 27, 2009[,] deposition?
>
> A       Yes.
>
> Q       And did you understand that Mr. Brown had some knowledge – you at least heard he had knowledge about TCE at the Red Spot facility, fair enough?
>
> A       Fair.
>
> Q       Did it concern you for you to sit down and hold your hand up and take an oath and answer questions about TCE and not have spoken to Mr. Brown, a former production manager at Red Spot?
>
> A       No, because my attorneys [(Ice Miller and Foley & Lardner)] had set [sic] through the deposition, and they had heard what Tom Brown had to say.

45

If they felt that that was something I needed to do, that I needed to talk to Tom Brown, then they would have told me to do that, and I would have done that. But apparently they had something else, another thought going on that. And we had talked to Charlie, who said that he didn't think Mr. Brown was right to us. That is why we didn't talk to him, and that was the direction I got and that was how I proceeded.

Q       You are testifying about facts as you know them or as you have gathered them from former employees or employees at Red Spot, fair enough?

A       Yes.

Q       And it didn't concern you that there was information in the possession of a former employee on a topic that you were offering corporate testimony [sic] and you, not the attorneys, were under oath to provide that answer. It didn't concern you that you were not going to obtain Mr. Brown's viewpoint directly so that you could report that in the deposition?

A       I considered Mr. Brown's testimony. I considered it, but again, with the other information that I gathered from Mr. Storms who knew Mr. Brown and that Mr. Brown was not a production manager for an extended length of time. I had other people I could talk to from the same time period that had conflicting information.

(*Id.* at 217-19.)

Henry testified at the sanctions hearing that she had provided information to BME about Super Ad-It and the fact that it contained PCE prior to her May 23, 2007, meeting with Storms and Cueller to prepare Storms for his May 24, 2007, deposition. (*Id.* at 246-49.) Henry stated that she thought they talked about Super Ad-It in that meeting and that she told Storms that Super Ad-It had PCE within it, but she recalled that Storms had not been aware that there was PCE within it until she told him the information. (*Id.* at 249, 256.)

## II. <u>STANDARD</u>

1100 West contends that sanctions are appropriate in this case under either Rule

37(b)(2)(A) and Rule 37(c)(1)(C), or under the inherent authority of the Court.  Although the

standards under each are similar, there are some differences; therefore, the Court sets out

both standards.

## A.  SANCTIONS UNDER RULE 37

Rule 37(b)(2)(A) states, in relevant part,

**(A)**    *For Not Obeying a Discovery Order.*   If a party or a party's officer,
director or managing agent—or a witness designated under Rule
30(b)(6)  .  .  .— fails to obey an order to provide or permit
discovery, . . . the court where the action is pending may issue further
just orders.  They may include the following:

  (i)    directing that the matters embraced in the order or other
designated facts be taken as established for purposes of the
action, as the prevailing party claims;

  (ii)    prohibiting the disobedient party from supporting or opposing
designated claims or defenses, or from introducing designated
matters into evidence;

  (iii)    striking pleadings in whole or in part;

  (iv)    staying further proceedings until the order is obeyed;

  (v)    dismissing the action or proceeding in whole or in part;

  (vi)    rendering a default judgment against the disobedient party;

  (vii)    treating as contempt of court the failure to obey any order . . . .

Fed. R. Civ. P. 37(b)(2)(A).

If a party fails to provide information as required by Rule 26(a) or (e), the Court may

impose any of the sanctions above as well.  Rule 37(c)(1)(C).

Generally, courts consider four factors when determining an appropriate sanction: the prejudice to the moving party, the prejudice to the judicial system, the need to punish the disobedient party, and the need to deter similar conduct in the future.  *See United States v. Reyes*, 307 F.3d 451, 458 (6th Cir. 2002); *Krumwiede v. Brighton Assoc., LLC*, No. 05 C 3003, 2006 WL 1308629, at *9, *11 (N.D. Ill. May 8, 2006).  No one factor is dispositive.  *See Reyes*, 307 F.3d at 458.  Any sanction under Rule 37 "'must be proportionate to the circumstances surrounding the failure to comply with discovery.'" *Langley ex rel. Langley v. Union Elec. Co.*, 107 F.3d 510, 514 (7th Cir. 2003) (quoting *Crown Life Ins. v. Craig*, 995 F.2d 1376, 1382 (7th Cir. 1993), citing *Newman v. Metro. Pier & Expo. Auth.*, 962 F.2d 589, 591 (7th Cir. 1992)).

The sanction of default under Rule 37 is only appropriate where there is "a clear record of delay, contumacious conduct or prior failed sanction" or where there is clear and convincing evidence[3] that a party displays wilfulness, bad faith or fault.  *Maynard v. Nygren*, 332 F.3d 462, 467-68 (7th Cir. 2003).  Fault is "unconcerned with the non-complying party's subjective motivation, but rather only describe[s] the reasonableness of the conduct - or lack thereof - which eventually culminated in the violation."  *Langley*, 107 F.3d at 514 (quoting *Marrocco v. Gen. Motors Corp.*, 966 F.2d 220, 224 (7th Cir. 1992)). *See also Long v. Steepro*, 213 F.3d 983, 987 (7th Cir. 2000).  Fault suggests objectively unreasonable behavior.  *Long*, 213 F.3d at 987.

---

[3]More recent opinions question the applicability of the "clear and convincing" standard of proof for Rule 37 sanctions, but do not decide the issue.  *See, e.g.*, *Ridge Chrysler Jeep, LLC v. DaimlerChrysler Fin. Serv. Ams. LLC*, 500 F.3d 559 (7th Cir. 2007).

Under Rule 37(b), sanctions for failure to comply with a discovery order, the Court may order both the client and the attorney to pay the movant's attorneys' fees and costs. Fed. R. Civ. P. 37(b)(2)(C). However, under Rule 37(c)(1), sanctions for failure to supplement discovery, the Court may order only the client to pay the movant's attorneys' fees and costs. Fed. R. Civ. P. 37(c)(1)(A).

## B.  SANCTIONS UNDER THE INHERENT AUTHORITY OF THE COURT

The Court "has the inherent power to sanction for conduct that abuses the judicial process. . . .  The power is governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Barnhill v. United States*, 11 F.3d 1360, 1367 (7th Cir. 1993) (citations omitted).  Generally, the Court must exercise its inherent powers with restraint and discretion. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991).  But, the Court has "the ability to fashion an appropriate sanction for conduct [that] abuses the judicial process." *Id.*  In doing so, the Court must consider the egregiousness of the conduct in question in relation to all aspects of the judicial process.  *See Greviskes v. Univs. Research Ass'n, Inc.*, 417 F.3d 752, 758-59 (7th Cir. 2005).  The most severe sanction, default, is available "'not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent.'"  *Id.* (quoting *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976)).

The Court may award attorneys' fees from both the client and the attorney under its inherent authority.  *See Chambers*, 501 U.S. at 45.  In addition, the Court may assess

attorneys' fees against counsel for wilful disobedience or bad faith.  *See id.*; *Maynard*, 332 F.3d at 470-71.

## III.  **DISCUSSION**

The purpose of discovery in the American system is not only to uncover likely witnesses and issues as set forth in the rules of civil procedure, but it also allows the parties to evaluate the facts so that trial strategies can be planned and the risks of trial assessed.  It is hardly a mystery that discovery could lead to settlement when each party has the information it needs to evaluate the strengths and weaknesses of its case compared to that of its opposing party.  Although plaintiffs do not bring suit unless they have performed some investigation of the merits pursuant to the requirements of Rule 11, many times the bulk of the details of the claims are uncovered during the discovery process.  When the Federal Rules of Civil Procedure on discovery changed to open up the inquiry into documents and things that are relevant or that might lead to something relevant, all policy decisions were made.  The parties are no longer at liberty to impose their own views to revise those policy decisions.

Moreover, when parties turn to the courts of the United States for resolution of disputes, they agree to abide by the rules of those courts.  Those rules include the rules of procedure and the rules of evidence.  But those are not the only guide for parties' behavior because an appearance in court also includes the attorneys' responsibility to adhere to the rules of professional conduct.  More specifically, attorneys must abide by their responsibility to be candid with the Court.  Attorneys have the responsibility to objectively address a client's case.  They also have a responsibility to objectively direct the

client in abiding by the rules of procedure, including the rules of discovery, and the rules of evidence.  Correspondingly, clients have a responsibility to be truthful, independent of the attorney-client relationship.

In this case, the evidence is replete with examples of violations of discovery rules, and those violations contributed to the time it has taken to resolve this dispute. Appropriate response to discovery matters often lead to earlier, less costly dispute resolutions.  But, the evidence in this case shows that Red Spot's responses—in answers to interrogatories, in responses to request for production of documents, and in depositions—have been a derogation of the rules and have extended this litigation beyond a reasonable time.

Red Spot continues to insist that this is a simple science case, that the newly discovered evidence makes no difference and that the delay caused by the discovery for 1100 West's Motion for Sanctions should not be laid at its door.  The Court cannot agree. While there may have been some legitimate objections to some of 1100 West's discovery requests, the crux of the requests—that is, where and when and whether certain chemicals, including TCE or PCE, were ever used or stored or were part of the waste stream of Red Spot—was never responded to with candor.  Both Henry and Storms assigned themselves the task of determining the credibility of witnesses and were able to keep 1100 West and the Court from addressing those issues of credibility and their effect on the merits of the case as required by law.  Given Red Spot's current position that this case is nothing more than a simple matter of an expert with facts (Red Spot's expert, Dr. Feenstra) versus an expert with conjecture and supposition (1100 West's expert, Dr.

Keramida), there seems to be no apparent motive for Red Spot to have played such an evasive game.

But, the Court is not even sure if all the facts have actually been revealed because neither Henry nor Storms has yet to be candid about the use, storage, or disposal of raw materials, products, wash-up solvent, degreaser, or waste that contained either TCE or PCE on Red Spot's property. After all the time and money that has been spent to uncover the truth, there is still no clear answer from Red Spot. Red Spot has made a mockery of the discovery process and has subjected the truth to ridicule. In the face of these findings, it seems inappropriate to argue that 1100 West has not been prejudiced.

Under the circumstances of this case, where the "tip of the iceberg," EPA RCRA file documents were disclosed ten days before trial, where the documents and testimony about the storage of TCE and PCE on Red Spot's property came to light only after a motion for sanctions had been filed, and where the Court is still not sure if the truth has been revealed, the Court is compelled to find that Red Spot's conduct was contumacious, wilful, and egregious. Therefore, the Court must conclude that only the most onerous sanction, default, can remedy Red Spot's violation of the rules of discovery, Fed. R. Civil P. 37(b)(2)(A)(vi); 37(c)(1), or can remedy Red Spot's complete disregard of the legal process as protected by the inherent authority of the Court. *Greviskes*, 417 F.3d at 758-59.

As suggested by 1100 West, both Storms and Henry played both judge and jury. Storms knew about Red Spot's historical use of chlorinated solvents as a degreaser for product development and troubleshooting purposes before he testified in this case. (Sanction Tr. at 50-51.) Storms knew that Red Spot's line of architectural paints used Super Ad-It, an additive. (*Id.* at 14-15.) He spent three and one-half hours discussing the

52

relevant issues, including the fact that Super Ad-It contained PCE at a level of 10%, with Henry and Cueller before he testified in May 2007.  (*Id.* at 249, 256.)  Yet, at his May 24, 2007, deposition, Storms denied that Red Spot used either TCE or PCE.  (Storms, May 24, 2007, Dep. at 63-64.)   At the sanctions hearing Storms tried to explain that at his deposition he was talking about usage of chlorinated solvents in the present tense.  But, that is not the question he was asked.  Storms was asked about the historical or past use of those products.  Storms simply failed to answer the question.  Moreover, Storms claims that he was unaware that Super Ad-It contained PCE.  However, Henry testified that she and Cueller discussed this issue with Storms before his deposition in May 2007. (Sanctions Tr. at 249, 256.)

Storms' attempt to justify his answers by explaining that, on the merits, the failure to disclose the small amount of chlorinated solvents used on the property, is to no avail. It was clear from Storms' testimony at the sanctions hearing that he decided that Red Spot's use of the relevant solvents was *de minimus*, therefore, he did not have to testify about what he knew.  (*Id.* at 50-51.)  Such a process flies in the face of the Federal Rules of Civil Procedure, which favors disclosure of relevant evidence as well as evidence likely to lead to relevant evidence.  In addition, Storms' decision to evade the truth makes a mockery of a witness' oath to testify to the whole truth.

Storms tainted the entire corporate discovery process by minimizing the importance of Henry's and Cueller's conversations with historic employees, including Sensmeier, Lutterbach, and Ward.  According to Storms, he met with Henry and Cueller and discussed their findings (*Id.* at 47-48), but, according to Henry, Storms made light of the facts by telling them that Red Spot would not use solvents like TCE or PCE because the company

made products for plastics.  Yet, Storms knew that for at least twenty years, until 1989, Red Spot also manufactured architectural products that, because of Henry's disclosure to him about the PCE in Super Ad-It, actually contained a chlorinated solvent.  (*Id.* at 14-17, 249, 256.)  He also knew that Red Spot had used chlorinated solvents in the vapor degreaser.  (*Id.* at 14, 30, 34.)  Storms' comments led to the suppression of the historical facts by both Henry and Cueller in the years that followed because neither Henry nor Cueller made an effort to reveal the historical employees' testimony or to uncover corroborative facts about the historical employees' testimony until October 2008 after revelation of the EPA RCRA file.

Storms continued to impede the process in 2009 when he dismissed Brown's testimony because, in Henry's words, "Storms didn't think Mr. Brown was right to us." Sanctions Tr. at 217-19.  Specifically, Henry recalled Storms telling her that "Mr. Brown only worked at Red Spot for 18 months in production, and that his statement about being sure TCE was used was not totally consistent with other employees' knowledge." (Henry, Rule 30(b)(6), Mar. 27, 2009, Dep. at 163.)  But, litigants cannot pick and choose between sets of facts within its corporate knowledge.  Under the Federal Rules of Civil Procedure litigants are required to reveal the facts so that they may be presented to the fact finder. Whether Sensmeier and Lutterbach are more credible than Brown about Red Spot's historical use of chlorinated solvents is not a decision that the federal litigation system leaves to the litigant who has the largest stake in the outcome.  The law does not protect those who decide for themselves that they are right and withhold evidence on that basis.

Henry is little better than Storms.  As Red Spot's designated Rule 30(b)(6) witness, Henry was required at each deposition for which she was so designated, to testify about

the collective knowledge of Red Spot, or what was "known or reasonably available to the organization." Fed. R. Civ. P. 30(b)(6). She testified that, by mid to late 2005, chlorinated solvents had become an issue in the case because TCE had been found in high concentrations on the 1100 West property by that time. (Sanctions Tr. at 121-22.) Henry knew by December 2005 that Super Ad-It, an additive for Red Spot's products, contained 10% PCE. (BME Sanction Hr'g Ex. DD.) When VanRheenen asked Henry to investigate the historical use of those solvents, Henry checked with Red Spot's information systems department but made no other effort to locate records or information about Red Spot's historical use of that product. (Sanctions Tr. at 243-46.)

By May 23, 2006, Henry, along with Cueller, had interviewed multiple Red Spot employees, many of whom had been with Red Spot much longer than Henry. At that point Henry had information that Red Spot had used chlorinated solvents in a vapor degreaser outside of Building 3. Some employees had suggested it was TCE that was used; some employees had suggested it was PCE that was used. Rather than start to investigate whether Red Spot had purchasing records, product formulation records, production records, or any other kind of documentary evidence to corroborate this testimony, Henry (and, apparently, Cueller) asked Storms about his recollection. Unfortunately, Storms misdirected Henry and Cueller by telling them that Red Spot did not use TCE or PCE in its products.

Henry, however, as a Rule 30(b)(6) designate in future depositions, had an independent obligation to tell the truth. If she had information that would lead to the discovery of relevant information about the use of TCE or PCE on Red Spot's property, and she was asked about it at a Rule 30(b)(6) deposition, she had the responsibility under

55

the Federal Rules of Civil Procedure to disclose the information.  By accepting Storms' view of the facts and withholding what she had been told by others, Henry obstructed 1100 West's ability to understand the nature and extent of Red Spot's use of TCE and PCE on Red Spot's property.  Henry's continued reluctance to admit that Red Spot used either TCE or PCE as a degreaser in a parts washer outside Building 3 is the definition of contumacious.  Likewise, Henry's continued reluctance to admit that Red Spot purchased and used a raw material that contained PCE is wilful.

Henry cannot hide behind BME, Cueller, or VanRheenen.  Neither of her lawyers was under oath when Henry testified as Red Spot's Rule 30(b)(6) witness or when she was under oath at the sanctions hearing.  Henry evaded questions and told half truths at every turn and, as she admitted, no one at BME ever told her to do so.  (Sanctions Tr. at 224.) Similarly, Henry testified that she knew BME was relying upon her to provide documents relevant to discovery requests; she even stated that when she had an idea about something on her own, she would go down to the basement of Building 3, look for more documents, then forward them on to BME.  (*Id.* at 233, 132-33.)  At the sanctions hearing, Henry made much of the fact that no one at BME helped her to organize Red Spot's historical files.  Yet, when Cueller visited in June 2006 to help, Henry opened the door to the basement and said, "Here they are."  (*Id.* at 136-37.)  In addition, in one email to BME, Henry emphatically stated that she had uncovered every document relevant to a particular request.  (*Id.* at 258-59 (discussing BME Hr'g Ex. JJ).)  Henry's email does not appear to be a cry for help.  (*Id.*)  Moreover, a litigant cannot hide behind its own failure to organize its records then rely upon its lawyer to straighten up its mess.  *See Leaf v. Cottey*, No. 1:02-cv-433-LJM-VSS, 2005 WL 2218232, at *5 (S.D. Ind. Sept. 8, 2005).

Henry's ability to evade questions and twist facts was evident in nearly every deposition, and was clear during the hearing before the Court. The February 7, 2006, deposition, in which Henry testified about purchasing records and the difference between AS400 information and FoxPro/Provision data, is a prime example. Henry had testified that she was the most knowledgeable person with respect to the chemicals contained within Red Spot's products. (Henry, Rule 30(b)(6), Feb. 7, 2006, Dep. at 163.) Apparently, she had come prepared to testify about Red Spot's production of purchasing records that would help identify the materials Red Spot purchased and what they contained. (*Id.* at 309.) Despite being asked if there were other purchasing records that would show the content of the raw materials purchased, Henry testified that AS400 was all Red Spot had, but then proceeded to explain how content information was not a purchasing record, it was a different kind of record that was in a different system, either FoxPro (for older raw materials) or Provision (for newer raw materials). (*Id.* at 283-84.) But the scope of 1100 West's questions encompassed both types of "purchasing records:" those that contained information about what raw materials were purchased and those that contained information about what chemicals made up those raw materials. Henry simply suggested that 1100 West had asked for the wrong information. (*Id.* at 284.) Similarly, during the sanctions hearing, when asked about Red Spot's most recent production of purchasing records in April 2009, Henry could not admit that she had testified evasively in earlier testimony about Red Spot's knowledge of other purchasing records. (Sanctions Tr. at 188-93.)

Finally, like with Storms, Henry's attempt to explain at the sanctions hearing why she could not have disclosed in May 2007 or September 2008 that Red Spot had used either PCE or TCE in a vapor degreaser, is to no avail. In essence, Henry testified that because

she had conflicting information from different historical employees and because Sensmeier said two different things on two different occasions about the use of TCE, she told the truth when she testified that Red Spot had not used TCE or PCE in a parts washer or vapor degreaser.  (*Id.* at 182, 201-03.)  As a Rule 30(b)(6) witness, however, Henry cannot decide the facts for herself, whether she received two conflicting reports or ten conflicting reports, but all responsive, she must disclose them all.  After reviewing countless pages of Henry's Rule 30(b)(6) testimony, and after listening to Henry at the sanctions hearing, the Court can only conclude that Henry's obstreperous conduct during this litigation has prolonged the discovery of relevant information and has led to countless hours of fruitless deposition testimony.

But, BME, through both Cueller and VanRheenan and, to a lesser extent, Lucas, had opportunities to steer Red Spot, particularly Henry and Storms, on a different path and it never did.  If all BME had was one individual who wished to ignore a small amount of information, it would be one thing.  In this case, however, the evidence that Red Spot had used TCE and/or PCE was too pervasive for BME to continue to ignore.  Henry disclosed to BME in 2005 that historical records indicated that PCE was a constituent of a raw material.  (Pl.'s Ex. 49, at RS110008577-78.)  VanRheenen requested more detailed information, but, after one inquiry of information systems, Henry responded that there was no other information.   (BME Sanctions Hr'g Ex. DD; Sanctions Tr. at 243-46.) VanRheenen never followed up or pressed Henry to look further.

On June 16, 2006, Henry reported to Cueller that two Red Spot employees had disclosed the use of TCE at Red Spot during the 1970s.  (Pl.'s Ex. 48, at BME00551-552.) Cueller forwarded the email to both VanRheenen and Lucas.  (*Id.*)  BME, on the same day,

allowed Red Spot to respond to 1100 West's First Request for Admission No. 8, which asked Red Spot to admit that it stored, used or handled TCE, commencing on January 1, 1980, with an answer of "no knowledge."  (Pl.'s Ex. 15.)  VanRheenen questioned whether any of the discovery requests in the case should be amended in light of Henry's email, but Cueller responded no, because of the time frame of the requests.  (VanRheenen Ex. 6, at BME01259, -62 to -63.)  But, it is clear that at least as to the March 1, 2006, Interrogatory No. 4, there was no temporal limit.  (Pl.'s Ex. 16, Interrog. No. 4.)  Interrogatory No. 4 requested information about the use or storage of TCE broadly, "as a substance or a constituent of a substance."  (Id.)  Moreover, by June 2006, Cueller had been to the basement of Building 3 and had seen the condition of the information in that room.  Yet, despite VanRheenen's and apparently, Lucas' concern over the completeness of Red Spot's discovery, and in light of the disclosures to Henry and Cueller about the potential for TCE and/or PCE used in the degreaser, Cueller decided not to do a complete inventory of the information contained in the sixty-eight boxes and two filing cabinets in the basement.[4]

At this point, BME had heard enough deposition testimony, had questioned enough of Red Spot's discovery responses itself, and had heard enough information from historical employees to guide Red Spot to make complete disclosure about any use of TCE or PCE on the property that it knew so that the lawyers could argue and a fact finder could determine the merits of the case.  Yet, BME pressed on with Red Spot's litigation strategy that neither of those two materials was ever used on the Red Spot property.  On March 28,

---

[4]Cueller testified that not all of those boxes were in the basement when she visited the site, (Cueller Dep. at 53.), but even if that is the case, Cueller did not do an inventory of the boxes she did see.

2007, BME filed a brief in which it asserted that Red Spot had never used TCE.  (Docket No. 145, at 3 (arguing against allowing 1100 West to do a visual inspection of the Red Spot property).)

In May 2007, Henry searched Red Spot's Provision database for PCE.  (Pl.'s Ex. 123, at BME 00794-95.)  The results of the search indicated that PCE was contained in Super Ad-It, at a concentration of 10%.  (*Id.*)  Henry forwarded the information to VanRheenen and Cueller on May 22, 2007.  (Pl.'s Ex. 49, at RS110028368.)  On May 23, 2007, Henry testified that Red Spot had never used TCE in a parts washer; Cueller represented Henry at that deposition.  (Henry, May 23, 2007, Dep. at 72.)

Also on May 23, 2007,  Cueller, along with Henry, prepared Storms for his May 24, 2007, deposition and discussed with Storms Red Spot's historical use of TCE and PCE as disclosed by other Red Spot employees.  (Sanctions Tr. at 246-49.)  Storms told Cueller and Henry that Red Spot would not have used those products because Red Spot made paint for plastics, which were not compatible with chlorinated solvents.  (*Id.* at 47.)  But, Cueller and Henry had just been refreshed about the fact that Red Spot had used Super Ad-It, which contained 10% PCE.  Apparently, this made no difference because Storms testified on May 24, 2007, that Red Spot did not use TCE or PCE on its property.  Cueller represented Storms at this deposition.  Again, BME had an opportunity to guide Red Spot to make a complete disclosure and it did not.

On May 25, 2007, Henry and/or Cueller contacted several Red Spot employees to inquire about TCE and PCE usage at Red Spot.  Jones told them he was sure PCE was used in the lab degreaser.  (Pl.'s Ex. 48, at BME00142.)  Jansen concurred.  (*Id.* at BME00144.)  The time frame of Jones' and Jansen's recollections was from 1968 to 1980.

60

(*Id.*)  Cueller was aware of this information.  But she never disclosed it to 1100 West in responses to discovery requests or in response to this Court's order to supplement discovery, and she never encouraged Henry to explain what she had learned in her next Rule 30(b)(6) deposition.

In July 2007, BME learned that the EPA had a "pretty extensive file" on Red Spot's Evansville location.  (Pl.'s Ex. 48, at BME07838.)  VanRheenen and Cueller were aware of this discovery.  (*Id.*)  In August 2007, BME obtained the EPA RCRA file and Klein reviewed the file.  (Klein Dep. at 160.)  Klein specifically looked for documents that indicated TCE, any chlorinated solvent, and any document about solvent-related spills. (*Id.*)  VanRheenen reviewed the file late that same month.  (Pl.'s Ex. 7, a D4-0039.) Although a BME paralegal arranged to have the EPA RCRA file "responsive" documents Bates-numbered, none was disclosed to 1100 West.  (*Id.* at D4-0039.)  Even given that VanRheenen's health was suffering at this time, Klein, a highly knowledgeable associate, and at least one paralegal knew about the file and did nothing.  Cueller's failure to keep track of an associate's work on the case in the absence of VanRheenen is equally troubling, particularly when Cueller was the self-proclaimed "litigation counsel."  Red Spot and BME cannot make an argument to the effect that the waste manifests in the EPA RCRA file were outside the time frames specified by 1100 West's discovery requests. Again, this was another opportunity for BME to guide its client to make disclosures, but BME did not.

By the end of June 2006, BME had enough collective knowledge that Red Spot likely used TCE or PCE in a lab degreaser or parts washer, which was consistent with 1100 West's expert's opinion, and that Red Spot had used Super Ad-It, which contained 10%

PCE, in a product at a time after Red Spot had implemented the Provision database, to question Storms' insistence that the chemicals were never used on the property. In addition, BME attorneys had sat through Henry's depositions, BME attorneys had questioned the thoroughness of Henry's production of documents, and a BME attorney had physically visited the room where Henry had searched for documents. Even in the face of Storms' insistence that Red Spot did not currently use TCE or PCE, there was enough historical information for BME to insist that Red Spot dig deeper. Being a zealous lawyer does not mean zealously believing your client in light of evidence to the contrary. Moreover, when BME obtained the EPA RCRA file, there is no excuse for BME's failure to ensure that "responsive" documents therein did not get to 1100 West.

The Court notes that it may be unusual to sanction a law firm for conduct that violates the Federal Rules of Civil Procedure. However, in this case, where three partners of the firm had knowledge of its client's apparent disregard for those rules and failed to properly supervise an associate and paralegal who had knowledge of adverse facts that remained undisclosed to the opposing party, the Court can only conclude that the firm must be held accountable under its inherent authority to deter such conduct in the future. *See Chambers*, 501 U.S. at 45.

In summary, at least starting in the summer of 2006, BME skated the edge of its responsibility to its client, to 1100 West, and to the Court under the Federal Rules of Civil Procedure to disclose relevant information as well as information likely to lead to relevant information. BME also failed in its responsibility to be candid with the Court by making statements in Court filings that it knew were misrepresentations at best and false at worst.

62

The Court concludes that Red Spot's conduct can only be described as contumacious, wilful, and egregious.  BME compounded the problem by, like a chameleon, becoming indistinguishable from its client and allowing Red Spot, namely Storms and Henry, to evade the truth.  Through its defiant conduct, Red Spot has forfeited the right to have the issues determined on the merits.  Therefore, the Court must conclude that only the most onerous sanction, default, can remedy Red Spot's violation of the rules of discovery; Fed. R. Civil P. 37(b)(2)(A)(vi); 37(c)(1); or can remedy Red Spot's complete disregard of the legal process as protected by the inherent authority of the Court. *Greviskes*, 417 F.3d at 758-59.  The Court, therefore, **GRANTS** 1100 West's Motion for Sanctions.

The Court **DECLARES**, pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 6972(a), and by **DEFAULT**, that defendant, Red Spot Paint & Varnish Co., Inc., is liable for taking all necessary action to abate and otherwise respond to the aromatic contamination plume and the TCE/PCE contamination plume on plaintiffs', 1100 West, LLC, property.  Plaintiff, 1100 West, LLC, shall file its proposed remedial plan on or before Tuesday, August 4, 2009.  On or before Monday, October 5, 2009, defendant, Red Spot Paint & Varnish Co., Inc., shall, in writing, **SHOW CAUSE** why the remedial plan proposed by plaintiff, 1100 West, LLC, should not be ordered as the remedy in this cause.  A **Show Cause Hearing is hereby SET for Wednesday, November 4, 2009, at 8:30 a.m.**, in Courtroom 202, Birch Bayh Federal Building and Untied States Courthouse, 46 East Ohio Street, Indianapolis, Indiana.  Defendant's, Red Spot Paint & Varnish Co., Inc., expert(s) shall only testify as to the appropriateness of the remedial plan; they shall not be allowed to testify as to causation at said hearing.

Further, 1100 West shall be entitled to its attorneys' fees and costs for all discovery dating from May 23, 2006, to the present, including expert discovery within those dates, and for its attorneys' fees and costs associated with the October 15 and 17, 2008, hearings, and its Motion for Sanctions.   1100 West shall file its brief in support of its accounting of reasonable attorneys' fees and costs within thirty days of the date of this Order.   Red Spot and BME shall have fifteen days to file a brief in opposition to said accounting.   Red Spot and BME shall each pay one half of said reasonable attorneys' fees and costs as they are determined by the Court, pursuant to Federal Rule of Civil Procedure 37(b)(2)(C) and pursuant to the inherent authority of the Court.

## IV.  **CONCLUSION**

For the foregoing reasons, plaintiff's, 1100 West, LLC, Motion for Sanctions is **GRANTED**.  The Court hereby **DECLARES**, pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 6972(a), and by **DEFAULT**, that defendant, Red Spot Paint & Varnish Co., Inc., is liable for taking all necessary action to abate and otherwise respond to the aromatic contamination plume and the TCE/PCE contamination plume on plaintiff's, 1100 West, LLC, property.  A **Show Cause Hearing is hereby SET for Wednesday, November 4, 2009, at 8:30 a.m.**, in Courtroom 202, Birch Bayh Federal Building and United States Courthouse, 46 East Ohio Street, Indianapolis, Indiana.  Details on briefing for said hearing are set forth in this Order.  In addition, the Court hereby **AWARDS** plaintiff, 1100 West, LLC, certain attorneys' fees and costs as set forth in more detail herein.

The Court Trial in this matter currently set for August 10, 2009, at 9:00 a.m., and the Final Pretrial Conference in this matter currently set for July 31, 2009, at 2:00 p.m., are hereby **VACATED**.  The parties shall proceed as set forth in this Order.

IT IS SO ORDERED this 5th day of June, 2009.

LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution attached.

65

Distributed to:

Adam  Arceneaux
ICE MILLER LLP
adam.arceneaux@icemiller.com

Thomas A. Barnard
TAFT STETTINIUS & HOLLISTER LLP
tbarnard@taftlaw.com

Lewis Daniel Beckwith
BAKER & DANIELS - Indianapolis
lew.beckwith@bakerd.com

Jayna Morse Cacioppo
TAFT STETTINIUS & HOLLISTER LLP
jcacioppo@taftlaw.com

Daniel  Cueller
SCRECKENGAST HELM & CUELLER
jagdc@msn.com

James D. Dasso
FOLEY & LARDNER LLP
jdasso@foley.com

George A. Gasper
ICE MILLER LLP
george.gasper@icemiller.com

Charles M. Gering
FOLEY & LARDNER LLP
cgering@foley.com

Beth S. Gotthelf
BUTZEL LONG
gotthelf@butzel.com

James Patrick Hanlon
BAKER & DANIELS - Indianapolis
jphanlon@bakerd.com

Richard A. Kempf
TAFT STETTINIUS & HOLLISTER LLP
rkempf@taftlaw.com

Katherine E. Licup
FOLEY & LARDNER LLP
klicup@foley.com

Rodney L. Michael Jr.
TAFT STETTINIUS & HOLLISTER LLP
rmichael@taftlaw.com

Patrick Michael Miller
DREWRY SIMMONS VORNEHM, LLP
pmiller@drewrysimmons.com

Eileen P. H. Moore
ICE MILLER LLP
eileen.moore@icemiller.com

Patrick David Murphy
BOVERI MURPHY RICE  LLP
pmurphy@bmrllp.com

Peter Jon Prettyman
Taft Stettinius & Hollister LLP
pprettyman@taftlaw.com

Charles P. Rice
BOVERI MURPHY RICE  LLP
crice@bmrllp.com

Steven C. Shockley
Taft Stettinius & Hollister LLP
sshockley@taftlaw.com

Wayne C Turner
BINGHAM MCHALE LLP
wturner@binghammchale.com

Judy L. Woods
Bose McKinney & Evans, LLP
jwoods@boselaw.com